[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties were married in Westport, Connecticut on June 17, 1995, following a year-long courtship. It was a second marriage for the plaintiff wife ("wife"), and the third visit to the altar by the defendant husband ("husband"). No children were born during the marriage to the wife, however, each party has grown children from a previous marriage. The parties have lived separate and apart since April 2001, when the wife moved out. She currently resides in a one-bedroom condominium. The husband continues to live in the former marital residence, a barn which was substantially renovated by the couple during the marriage.
The wife is forty-nine years old and, according to her testimony, enjoys good health. She has an associate's degree from the University of Bridgeport. For much of her first marriage she was a stay-at-home mother. She entered the workforce, first as an office manager for a funeral home making about $30,000 per annum. Later she worked at Procter and Gamble for ten years where she earned between $13,000 and $25,000 per year. She was an executive with Orial for three and one-half years at $30,000. For the past five years she has been a manager at Purdue Pharma with a base salary of $63,300 and a bonus equal to three weeks' salary. At the time of the marriage, she owned an eight-room colonial home in Huntington, Connecticut. After discussing the matter with her husband-to-be, she agreed to sell the home and to move to the converted barn, which would need extensive renovations. The proceeds from her home sale were invested in an annuity.
The husband is sixty-five years old and in apparent good health. He is an architect by profession and has been a partner in a two-man firm called Montoya-Rodriguez, P.C., Architects for the past eighteen years. His practice is primarily in New York, and, according to his testimony, the firm has enjoyed regular contracts with the City of New York regarding dormitories and hospitals. His annual income is approximately $100,000. CT Page 2930
At issue in this case is the validity of a certain Ante-Nuptial Agreement ("Agreement") dated June 17, 1995, quite literally signed on their wedding day, just hours prior to the ceremony. The document itself was drawn by the husband's New York counsel. The wife hired a Connecticut attorney to review it and to represent her. There was correspondence between counsel, and the wife's attorney suggested several changes. The week before the wedding was a contentious one for the parties. Of particular concern to the wife was the lack of a satisfactory provision for her regarding the marital home in the event of a divorce, similar to the eventuality of his death. In short, the wife sought a vested interest in the dwelling amounting to $200,000. In her words, she wanted "her name on the deed." On June 16 the parties and their respective attorneys were scheduled to meet and review the final draft at the husband's lawyer's office in White Plains. The wife's lawyer had not seen the final draft, nor had the parties exchanged financial information, and he had arranged to meet the wife in Westport so that they could drive together to the New York meeting. What transpired at that point is vintage "soap opera." While sitting in the commuter parking lot, the wife tearfully informed her attorney that the husband had called the wedding off and that she was "devastated." She had earlier told her husband that she was "not comfortable" with the agreement in its then final form, and his reaction was resoundingly negative. Later that evening, in part through the auspices of a mutual friend, the parties had a lengthy meeting at the Westport home. The wife went home to think about things. She had a change of heart the next day, and without the presence of her attorney, or his review of the final document, she signed, testifying that she was "emotionally drained" and lacked the "energy" for further dispute. She felt "trapped" and "manipulated." Accordingly, the wife contends that the Agreement is invalid and should not be enforced. On the other hand, the husband, quite understandably, argues that is valid and should be enforced.
In brief, the parties agree that premarital agreement was executed on June 17, 1995, that the husband was represented by counsel throughout; that the husband's attorney was the principal draftsman, that the wife had the benefit of an attorney for at least some of the negotiations, and that the wedding would not have taken place in the absence of a signed Agreement. From there, the stories diverge.
The court heard the parties over the course of three days. The wife's attorney, Louis Parley, Esq. testified, as did Lawrence W. Pollack, Esq. a New York attorney. The court also heard from Linda Young and Diane Kilroy.
Two legal questions have been presented to the court concerning the CT Page 2931 Agreement. First, and foremost, since the instrument declares that New York law is to be applied, should the parties be bound by their choice of law. This is the threshold question to be determined. Assuming that the court finds New York law to apply, the second question to be determined is whether or not the Agreement is valid and enforceable under all the circumstances.
 LAW
AS TO THE CHOICE OF LAW:
In general, where the parties to a contract have chosen the law of a particular state to govern their dealings, that choice is honored by the court of the forum state. This basic principal is articulated in the § 187(1) Restatement (Second) Conflict of Laws.
The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
When presented with a similar issue, in the case of Elgar v. Elgar,238 Conn. 839 (1996), the Connecticut Supreme Court resolved it by upholding the parties' choice of law, also New York. At issue was the disposition of assets at the death of the spouse. There, the case was heard by an attorney trial referee, who made certain findings, interalia, that the wife, also unrepresented at the signing, would have signed in any case, and that "there was no evidence of misrepresentation, fraudor undue influence underlying the parties' choice of New York law." (Emphasis added) That conclusion having been reached, the court was in a position to interpret the contract and the circumstances of its execution under New York law.
Likewise, in looking at the facts and circumstances of this case, the court reaches the same conclusion. It was clear from the beginning that the husband wanted a premarital agreement, and as customary, his attorney (a New York attorney) drafted the document containing, inter alia, a choice of the application of New York law in its execution and interpretation. During the negotiations, at least up until the day before the wedding, both parties were represented by counsel, and no objection was raised as to the choice of law at that time. In this case, the court finds no credible evidence of misrepresentation, fraud or undue influence in the choice of law. Accordingly, the court finds that it is appropriate to apply New York law. CT Page 2932
AS TO THE VALIDITY OF THE AGREEMENT:
Under New York Domestic Relations Law, § 236, Article 13, para. 3, an antenuptial agreement is "valid and enforceable in a matrimonial action if such agreement is in writing, subscribed by the parties, and acknowledged or proven in the manner required to entitle a deed to be recorded." The evidence in this case clearly demonstrates that those basic conditions have been met. (Plaintiff's Exhibit #1) However, the inquiry does not always end there, since New York courts look to see whether or not the terms of the agreement are "unconscionable at the time of entry of final judgment." New York Domestic Relations Law, § 236,Article 13, para. 3. Where a party to an agreement can "establish a fact-based, particularized inequality," the burden shifts to the party seeking enforcement to "prove freedom from fraud, deception or undue influence." In the Matter of the Estate of Herman Greiff, Deceased,92 N.Y.2d 341, 346-47, 703 N.E.2d 752, 680 N.Y.2d 894 (1998). Moreover, the test to be applied as to whether or not the bargain is unconscionable, is if the inequality is "so strong and manifest as to shock the conscience" and not merely that the agreement might be "improvident." Clermont v. Clermont, 198 App.Div.2d 631, 632,603 N.Y.S.2d 923 (1993). Absent proven facts, the court will not infer or presume fraud. On the contrary, such an agreement is presumed valid in the absence of fraud. Sunshine v. Sunshine, 51 App.Div.2d 326, 327,381 N.Y.S.2d 260 (1976).
The wife contends that the agreement offends the public policy of the State of Connecticut, and she has asked the court not to enforce it. Admittedly, the argument has some resonance with this court from a strictly parochial viewpoint. The Connecticut legislature has made a clear statement of public policy with the adoption of the Connecticut Premarital Agreement Act, otherwise known as General Statutes § 46b-36a
et. seq., however, the act applies to agreements executed on or after October 1, 1995. In addition, the Connecticut Supreme Court has offered a roadmap for premarital travelers in the case of McHugh v. McHugh,181 Conn. 482 (1980). There at page 487, the court observed that:
Under ordinary circumstances, the parties to an antenuptial agreement do not deal at arm's length; they stand in a relationship of mutual confidence that calls for the exercise of good faith, candor and sincerity in all matters bearing upon the agreement.
As tempting as that siren song sounds, this court must turn a deaf ear and apply New York law, where, in fact, there is a "strong public policy favoring individuals ordering and deciding their own interests through contractual arrangements." Bloomfield v. Bloomfield, 97 N.Y.2d 188, 193, CT Page 2933764 N.E.2d 950, 738 N.Y.S.2d 650 (2001).
As this court has often observed, an antenuptial agreement is the singularly most unromantic legal document imaginable. However, as is so often the case, inherent in the document, and, in fact, in the process itself, is an inequality in the respective bargaining positions of the parties. One or both parties have something to protect, and they seek a waiver of rights from the other. Inequality in a bargaining position is not in and of itself grounds to void an agreement otherwise valid. Likewise, the absence of an independent attorney for one party, alone, will not invalidate an agreement on the basis of fraud. In the Matter ofthe Estate of J. Robert Garbade, 633 N.Y.S.2d 878, 879-80,221 App.Div. 844 (1995); Panossian v. Panossian, 172 App.Div.2d 811,569 N.Y.S.2d 182, 184 (1991).
The wife has asked the court to draw the conclusion that the husband's elimination of the phrase "earned income" from the final agreement was somehow fraudulent or deceptive. As with any contract, the court looked to the Agreement as a whole to find meaning. MacAllister v. MacAllister,275 App.Div.2d 1015, 1016, 713 N.Y.S.2d 596 (2000). After listening to the parties over the course of several days, this court concludes that there existed anything but a lack of candor between them. Quite the contrary. Prior to the marriage, each party maintained strongly-held positions, in particular with regard to the Westport house and its disposition in the event of a divorce. Each party articulated those views bluntly, and, perhaps, without the necessary diplomacy and sensitivity toward the other given their respective marital histories. Each continued to articulate those selfsame views throughout the marriage; and, in fact, continue to do so to this day. It has always been about the house.
Of perhaps what should be of greater concern to the wife, the husband has asked the court to grant some relief outside of the "four corners" of the Agreement he wishes the court to uphold. This the court is not prepared to do. Neither party has entirely clean hands in this sad affair. The Agreement very clearly calls for an equal division of the net appreciation in value of the assets originally disclosed in Schedules C and D attached thereto, and this the court proposes to accomplish.[1]
The husband's claims above and beyond the division are unfair and unwarranted, and they are quite frankly, under all the circumstances, rather heavy-handed.
Like shrill, parallel monologues, their marriage, that "unique human relationship," never blossomed into a true twining of body and soul. Even Katharina and Petruchio ultimately found a way to make it work! CT Page 2934
 FINDINGS
The Court, having heard the testimony of both parties, and having considered the evidence presented at hearing, as well as the factors enumerated in General Statutes §§ 46b-40, 46b-51, 46b-62, 46b-63,46b-81, and 46b-82, hereby makes the following findings:
 1. That it has jurisdiction.
2. That the allegations of the complaint are proven and true.
3. That the marriage of the parties has broken down irretrievably, and that ample evidence exists that both parties have contributed to said breakdown.
4. That neither party seeks periodic alimony from the other party; that based upon the statutory factors, including the age, length of marriage, education, earnings, and work experience, each party is able to support him or herself, it is equitable and appropriate that neither party pay periodic alimony to the other; and that their waiver of alimony is valid.
5. That the parties entered into a written Stipulation dated October 22, 2002, as on file with the court, that the fair market value of the real property located at 193 Newtown Turnpike, Westport, Connecticut, is $810,000; and that each party contributed substantially to the appreciation in its value.
6. That the parties entered into a pre-nuptial agreement dated June 17, 1995; that under the terms thereof, the parties agreed that New York law would apply to same, and that said choice of law should be honored; that under all the facts and circumstances surrounding the negotiation and execution of said agreement, there was no evidence of fraud, imposition, concealment, or imposition; that it is a valid agreement; and that it is appropriate that the court give effect to the terms thereof.
7. That the evidence indicates that at the time of the execution of the Agreement, the husband's separate property as set forth in Schedule C of the Agreement had a value of $1,107,000; that taking into account gains and losses in value, the value of these assets was $1,856,498; and that the appreciation in value during the marriage was $749,498.
8. That the evidence indicates that at the time of the execution of the Agreement, the wife's separate property as set forth on Schedule D of the Agreement had a value of $221,186; that taking into account gains and CT Page 2935 losses in value, the value of these assets was $300,377; and that the appreciation in value during the marriage was $79,191.
9. That the combined appreciation of the husband and wife's separate property was $828,689; that, after considering all of the provisions of the Agreement as a whole, under the terms of same each party is entitled to one-half (1/2) the value of said appreciation, which amounts to $414,345; and that after a credit to wife in the amount of $79,191, the husband owes her the sum $335,154.
10. That under the terms of Article 32 of the Agreement, should either party initiate litigation with respect to the Agreement, the successful party is entitled to reasonable attorneys fees as fixed by the court; that the wife has initiated a claim challenging the validity of the Agreement; that the court has found the Agreement to be valid and enforceable; that the court finds that the reasonable attorneys fee attributable to this challenge is $15,000 which may be deducted from the sums to be paid to the wife pursuant to Paragraph 9 above, Goold v.Goold, 11 Conn. App. 268, 288-89 (1987); and that, in any event, the court finds that each party has sufficient liquid assets and should be responsible for the balance of their respective attorneys fees and costs incurred in connection with this action. Maguire v. Maguire, 222 Conn. 32
(1992).
 ORDER
IT IS HEREBY ORDERED THAT:
1. The marriage of the parties is hereby dissolved, and they are each hereby declared to be single and unmarried.
 2. No alimony is awarded to either party.
3. The husband shall have exclusive possession of the real property located at 193 Newtown Turnpike, Westport, Connecticut, and shall retain title to same free and clear of any claims of the wife, subject to any existing mortgages and liens thereon. In addition, the husband shall be entitled to retain his interest in the real estate 127 West 24th Street, New York, New York, free and clear of any claims by the wife. Simultaneous with the payment of the lump sum pursuant to paragraph 4 hereof, the wife shall, at her sole expense, prepare and record a fully-executed Release of Lis Pendens with the Town Clerk of Westport.
4. The husband shall pay to the wife the sum of $320,154 within ninety (90) days from the date of this Memorandum of Decision, which sum CT Page 2936 represents 50% of the net appreciation in value of the assets per their Agreement, less a credit to the wife for the net appreciation of her separate assets and a credit to the husband for attorneys fees.
5. Personal property shall be divided as follows:
A. With the exception of those items set forth below, the home furnishings located at 193 Newtown Turnpike, Westport, Connecticut, shall belong to the husband, free and clear of any claims by the wife.
B. Each party shall be entitled to keep the automobile which they are currently driving free and clear of any claims by the other, and each party shall cooperate with the other regarding the execution of any documentation necessary to transfer and/or register same.
C. Except as otherwise set forth herein, each party shall be entitled to keep their respective savings, checking, and money market accounts free and clear of any claims by the other.
D. The wife shall be entitled to the following items of personal property from the premises at 193 Newtown Turnpike, free and clear of any claims by the husband:
1) antique oak dresser
2) antique Heuser
3) antique oval tray
4) armoire, bachelor's chest, and armchair from the master bedroom
5) four to six antique roosters
6) six antique ducks
7) two Italian ceramic plates
8) bird bath
9) print in master bedroom
10) arrangement on dining room table
11) tools and outdoor equipment CT Page 2937
12) freezer
13) the afghan (owned prior to marriage)
14) carpet and area rugs
E. The wife shall be entitled to retain the following items free and clear of any claims by the husband:
1) all stocks and bonds in her sole name
2) Purdue Frederick Retirement Savings Plan (401(k))
3) A. G. Edwards IRAs
4) Procter Gamble Shareholder Services Plan
5) Hartford variable annuity
6) personal jewelry
F. The husband shall be entitled to retain the following items free and clear of any claims by the wife:
1) all stocks and bonds in his sole
2) Montana-Rodriguez, P.C. Pension Plan
3) Montana-Rodriguez, P.C. Profit-sharing Plan
4) Ownership interest in Montana Rodriguez, P.C.
5) 1965 Columbia sloop
6) personal jewelry
7) St. Thomas timeshare
6. The wife shall promptly notify her employer as to the change of marital status and shall cooperate with the husband in obtaining continuation health insurance coverage as provided by state and federal law. The husband shall be responsible for the payment of any premiums due for such coverage.
7. Except as otherwise set forth herein, the parties shall each be CT Page 2938 responsible for the debts as shown on their respective financial affidavits, and they shall indemnify and hold each other harmless from any further liability thereon.
8. Except as set forth hereinabove, each party shall be responsible for their respective attorneys fees and costs incurred in connection with this action.
 THE COURT SHAY, J.