## MARYANN H. DORNEMANN *v.* MICHAEL DORNEMANN

Superior Court, Judicial District of Stamford-Norwalk
File No. FA-03 0194829S

Memorandum filed April 14, 2004

---

*Cohen & Wolf* and *Richard L. Albrecht*, for the plaintiff.

*Rutkin & Oldham* and *Law Offices of Gary I. Cohen* and *Mark R. Soboslai*, for the defendant.

*Joseph T. O'Conner*, for the minor children.

*Elizabeth Bergen*, guardian ad litem, for the minor children.

## FACTUAL BACKGROUND

WINSLOW, J. Maryann H. Dornemann, the plaintiff, has moved to preclude evidence of the parties' premarital agreement at the divorce trial. The special defense of the defendant, Michael Dornemann, claims that the premarital agreement governs the central issues in the divorce. The plaintiff asserts that the premarital agreement is unenforceable for four reasons. First, written financial disclosures were not attached to it. Second, it was executed by the plaintiff as the result of undue influence and lack of free will. Third, it was not signed by the defendant and, therefore, was not in proper form. Fourth, and finally, it was not delivered to the plaintiff after signature by the defendant. The court heard testimony and received exhibits on January 7, January 8, January 9, February 18, February 27 and March 4, 2004.

The more credible evidence leads to the following factual findings. The plaintiff, whose maiden name was Maryann Hegel, grew up in Tennessee. After three years of college in Tennessee, she attended a fine arts school in Florida and received an associate's degree in interior design. The plaintiff worked as a model, then a restaurateur. The plaintiff freelanced as an interior designer and

lived in her own apartment on 71st Street in New York City when she met the defendant on a blind date on September 25, 1995.

The defendant is a German national. He has a master's degree in business administration and a Ph.D. in economics. When the parties met, the defendant was involved in mergers and acquisitions with Bertelsmann AG and was an active member of its executive board. He is now chief executive officer of BMG Entertainment, which is a $10 billion global music and television business.

The parties' dating in the latter part of 1995 included two trips to Europe. The defendant owned residences and vacation homes in various parts of Europe and the United States. In January, 1996, the defendant ended his relationship with a former girlfriend. Shortly thereafter, the plaintiff gave up her work and her apartment and moved into the defendant's New York apartment. She also traveled with the defendant to some of his other homes, in Europe and in the United States. The parties discussed the possibility of marriage three or four times in 1996. The defendant made it clear that a prenuptial agreement would be a necessity if he were to remarry. He had been married twice before and had required a prenuptial agreement each time.

When the parties were staying at one of the defendant's two homes in Aspen, Colorado, in January, 1997, the plaintiff told the defendant that she was pregnant. The parties decided to marry. They telephoned their families to announce the engagement. Shortly thereafter, the defendant reminded the plaintiff that a prenuptial agreement was a necessity. Without such an agreement, he would support the child, but he would not marry the plaintiff. The plaintiff loved the defendant, she was pregnant and she wanted to marry as soon as

possible. She did not wish her pregnancy to be physically apparent to others on her wedding day. The parties set April 13, 1997, as the wedding date. The defendant urged the plaintiff to hire a lawyer to provide advice regarding the prenuptial contract.

The defendant retained his corporate lawyer, Aydin Caginalp, in January, 1997. Caginalp used attorney Ben Fraser as Connecticut counsel for further advice in this matter. On February 19, 1997, the defendant conveyed to Caginalp the name and telephone number of the plaintiff's lawyer. The plaintiff had selected attorney Alicia Gany at the recommendation of the plaintiff's sister. Gany solicited the advice and assistance of another New York attorney, Harold Meyerson, and a Connecticut family law specialist, attorney Samuel Schoonmaker. The plaintiff instructed her accountant in Tennessee to remit financial information to Gany. Conceptual discussions between the parties took place in February. Between February 19 and March 10, Caginalp made seven different drafts of the prenuptial contract. He provided his fourth draft to Gany on February 28.

By the time the defendant left for a business trip to Germany on February 27, 1997, he had seen two or three early drafts of the prenuptial agreement. The parties and their attorneys had had further negotiations about the agreement. Changes were made through drafts five and six, culminating in draft seven on March 10. The changes varied from grammatical corrections to substantive matters, such as an increase in the amount of the upfront lump sum payment to the plaintiff in the event of divorce. The plaintiff traveled to Zermatt, Switzerland, on March 3, 1997. The defendant joined the plaintiff in Zermatt on March 4. The parties left Zermatt for Munich, Germany, on March 14. Both parties communicated with their respective lawyers regarding the terms of the prenuptial agreement and the financial disclosures

while they were in Zermatt and Munich. Gany advised the plaintiff not to sign the premarital agreement in its draft seven version. Gany acknowledged in a letter to the plaintiff that the plaintiff was determined to sign the premarital agreement despite Gany's advice to the contrary.

On March 10, 1997, Caginalp forwarded, by Federal Express, two originals of the premarital agreement to the defendant in Munich, together with instructions for the execution of the documents before a notary or before two witnesses. Financial statements were not attached to the original documents. Financial information had been remitted separately between the attorneys. The defendant's disclosure was detailed in over 100 pages, supplemented by a four-page precis. The attorneys, in turn, remitted financial information to their respective clients prior to March 17, 1997. On March 10, 1997, Gany sent to the plaintiff in Europe a letter from Schoonmaker, the consulting Connecticut attorney, summarizing the defendant's financial condition.

Caginalp had no further contact with Gany after March 10 and no further communications with the defendant regarding the prenuptial contract until the current court proceedings. Caginalp never received any signed copy of the prenuptial contract. Gany had no further contact with Caginalp after March 10 and no further communications with the plaintiff regarding the prenuptial contract until the plaintiff was about to commence divorce proceedings. Gany never received any signed copy of the prenuptial contract.

The defendant's office arranged an appointment with a notary in Munich for Monday, March 17, 1997, when the parties were to execute the prenuptial agreement. Because the defendant was called away on business in Luxembourg and Gütersloh at the last minute, only the

plaintiff kept the appointment with the notary. She knew that the defendant would not marry her without a prenuptial agreement in place. She chose to proceed with the signing of the agreement because she wanted to marry the defendant. She took the blank documents to the notary, and she executed two originals of the prenuptial contract on March 17, 1997 (the Munich versions). She spent a few days in Nice, France, and then returned to Munich on Friday, March 21. The defendant also returned to Munich on March 21 and took possession of the partially executed contracts that day. At the end of the weekend, the defendant went to Paris and the plaintiff went to New York City. The defendant returned to New York City on Thursday, March 27.

Through the end of March, 1997, the parties' descriptions of events are essentially the same. There is no reconciling the parties' separate accounts concerning the execution of, and control over, the prenuptial documents after March, 1997. It is certain that one of the parties is lying. The plaintiff asserts that she never saw the Munich versions after March 21, 1997, until February, 2003. She denies that the defendant ever gave back to her a Munich version of the prenuptial agreement. She denies that the defendant ever provided to her a copy of the prenuptial agreement signed by him.

In February, 2003, the plaintiff was contemplating divorce. While the defendant was away on business, the plaintiff went to the parties' safe in their Greenwich home, found the two Munich versions, left one in the safe, and took one out. The two Munich versions were the only prenuptial documents in the safe when she looked there. The defendant had signed neither Munich version. On March 6, 2003, the plaintiff took a Munich version with her for her divorce consultation with a Manhattan lawyer. She left with her lawyer the Munich version she had removed from the safe in February.

The defendant has quite a different story. He explains that his New York office acquired two additional blank originals of the prenuptial agreement from Calginalp.[1] The defendant asserts that he took the two blank originals to a restaurant on April 1, 1997, where he met his friend and business associate, Douglas Diamond. He signed the two originals that day, and Diamond signed them as a witness (Diamond counterparts). The defendant gave one of the Diamond counterparts to the plaintiff that same day and instructed her to combine it with the Munich version to make a completely executed agreement. The defendant does not explain satisfactorily why it was necessary for him to sign separate blank originals, instead of the Munich versions. He cites his busy schedule as the reason for his disregard of the instructions of his attorney as to the execution of the prenuptial agreement before a notary or two witnesses.

In December, 2002, the defendant was planning a climbing expedition to Cerra Aconcagua in the Andes. He wanted to review the provisions of his will. He claims that he went to the safe in the Greenwich home, took out his will and his Diamond counterpart of the prenuptial agreement, and made copies of those two documents. He says that he then replaced the will and the original Diamond counterpart in the safe. He did not look in the safe again until April, 2003. He kept the copies of the two documents in a file folder for later reference and departed for Argentina on January 24, 2003, for the seventeen day expedition. After the defendant returned from Argentina, he joined his wife in Antigua for one week and Vermont for a few more days. The parties returned to Greenwich on Monday, February 24. The defendant then reviewed the copied documents as he

---

[1] Caginalp denies that he supplied additional blank prenuptial agreements to the defendant. Caginalp agrees, however, that a staff member in his law firm may have supplied such copies to the defendant upon the defendant's request.

flew to Europe for business purposes on February 25, 2003. He left the copies in his office safe in Munich.

The defendant learned on April 12, 2003, that his wife wanted a divorce. The divorce writ was served upon him on April 15, 2003. He then looked in the Greenwich safe for the prenuptial agreement. He says he did not find his Diamond counterpart, but only a Munich version. When he returned to Germany on April 23, 2003, he retrieved his copy of the Diamond counterpart. The defendant testified that he showed his copy of the Diamond counterpart to his lawyer in May, 2003, but did not give the copy to him at that time. The defendant's lawyer testified that the defendant told him in May, 2003, about a prenuptial document signed by the defendant in the presence of a witness, but did not show it to him at that time.[2]

Shortly after the divorce action commenced, the defendant's attorney, Arnold Rutkin, thought that the plaintiff might try to disavow the validity of the prenuptial contract. Rutkin advised the defendant to sign his Munich version without dating his signature. The defendant signed the document at his home in Greenwich in June, 2003 (Greenwich version). It was the Greenwich version that the defendant attached to his answer and special defense for his pleadings in the present case.

The defendant showed the copy of the Diamond counterpart to his lawyers for the first time in November, 2003. The defendant's lawyers provided a copy of the Diamond counterpart to the plaintiff's attorneys at the

---

[2] At the direction of his attorney, the defendant recited the marital history of the parties to a transcriber on May 23, 2003. The defendant's attorney received the information about the existence of the counterpart from the reading of the transcription. The defendant's reference to the Diamond counterpart in the recital was as follows: "[S]he notarized her signing of the prenuptial in Germany without my presence, whereas I signed a copy— whereas I signed only alone, yeah, whereas I signed, yeah, a copy with— later on with in presence of a witness but had no time to notarize it."

beginning of December, 2003, in a packet of discovery materials. Prior to that time, the defendant and his attorneys had not disclosed to the plaintiff's attorneys the claim that the Diamond counterpart existed. At a deposition on December 19, 2003, the defendant also provided, as an exhibit, a copy from Caginalp's file of the letter and blank prenuptial agreement that Caginalp had sent to Munich in March, 1997.

The plaintiff's description of the finding of the Munich versions in the Greenwich safe and her actions thereafter is credible. The defendant's testimony and that of Douglas Diamond is not convincing. The defendant's account is incongruous. He intended the prenuptial contract to be in place and valid prior to the April 13, 1997 wedding. For reasons known only to him, he delayed his own execution of the documents until 2003. He did not sign any version of the premarital agreement prior to the marriage of the parties.

The validity of prenuptial contracts in Connecticut is governed, since October 1, 1995, by the Connecticut Premarital Agreement Act (act). General Statutes § 46b-36a et seq. Prior to the act, our Supreme Court had set forth the standards for determining the validity of a prenuptial agreement in *McHugh* v. *McHugh*, 181 Conn. 482, 436 A.2d 8 (1980), as follows: "The validity of an antenuptial contract depends upon the circumstances of the particular case. . . . Antenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) its terms do not violate statute or public policy; and (3) the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice." (Citation omitted.) Id., 485–86.

The act endorses, clarifies and codifies the *McHugh* standards.

I

The plaintiff argues that the premarital agreement is unenforceable because written financial disclosures are not attached. General Statutes § 46b-36g (a) provides in pertinent part: "A premarital agreement or amendment shall not be enforceable if the party against whom enforcement is sought proves that . . . (3) Before execution of the agreement, such party was not provided a fair and reasonable disclosure of the amount, character and value of property, financial obligations and income of the other party . . . ." The actual review of the financial disclosure by each party is not mandated by the statute. The plaintiff acknowledges that the defendant provided full and detailed financial disclosure to Gany before the execution of the premarital agreement. "The knowledge and admissions of an attorney are imputed to his client." *Lafayette Bank & Trust Co.* v. *Aetna Casualty & Surety Co.*, 177 Conn. 137, 140, 411 A.2d 937 (1979). Gany forwarded the Schoonmaker summary to the plaintiff before the plaintiff signed the premarital agreement. The plaintiff had not only the imputed knowledge of her attorney as to the defendant's finances, but also actual knowledge from the Schoonmaker letter.

The act does not require the attachment to the agreement of written financial disclosures. Where a contract refers to another instrument in such a manner as to establish that the terms and conditions of that other instrument are part of their understanding, the two may be interpreted together as the agreement of the parties. *Batter Building Materials Co.* v. *Kirschner*, 142 Conn. 1, 7, 110 A.2d 464 (1954). Attachment of the second instrument to the contract is not a necessity. Id.

The definition section of the premarital agreement mentions the financial disclosure statements and the attachment of the disclosures. This section merely refers to the financial disclosure statements as containing a list, or partial list, of the parties' assets and income. The disclosures themselves are not the focus of the definition section. They are referenced as an aid or starting point for an inventory of assets.

The plaintiff argues that the sixth "whereas" clause at the beginning of the premarital agreement refers to "the Husband's Disclosure Statement and the Wife's Disclosure Statement *attached hereto.*" (Emphasis added.) She argues that because the "whereas" clause of the agreement contemplates the attachment of the disclosures, failure to attach the disclosures renders the contract incomplete and deficient. "[R]ecitals in a contract, such as whereas clauses, are merely explanations of the circumstances surrounding the execution of the contract, and are not binding obligations unless referred to in the operative provisions of the contract. . . . [A]lthough a statement in a whereas clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document . . . ." (Citations omitted; internal quotation marks omitted.) *DeMorais* v. *Wisniowski*, 81 Conn. App. 595, 610–11, 841 A.2d 226, cert. denied, 268 Conn. 923, 848 A.2d 472 (2004). The only operative portion of the premarital agreement relating to adequacy of disclosure is article I. That section acknowledges that each party has made full and fair financial disclosure and sets forth the specific dates on which disclosure was made. Article I, however, does not require, or even refer to, attachment of the disclosures. No part of the premarital agreement suggests that the agreement will be rendered inoperative by the omission of attachments.

## II

The plaintiff claims that she was unduly influenced to sign the premarital agreement and that she lacked free will at the time of signature. When the plaintiff completed her body of evidence and rested her case, the court made findings as to the plaintiff's free will and independent capacity at the time of her execution of the premarital agreement. The court ruled that the plaintiff did not sign the premarital agreement under the disabilities of undue influence or lack of free will. The court found the testimony of the plaintiff to be truthful and persuasive as to her reasons for signing the prenuptial agreement. She failed to prove that the statements or actions of the defendant overbore her will. The defendant was neither coercive nor intimidating in his insistence upon a prenuptial agreement. He was, however, consistent and adamant that he would not marry the plaintiff without the benefit of such an agreement. The plaintiff had alternatives. She could have attempted further negotiations of the contract. She could have delayed the wedding. She could have refused to sign and, consequently, remained unmarried with an illegitimate child.

The evidence showed that the plaintiff was a college graduate with experience as a businesswoman. She had sufficient time to reflect upon her decision to proceed. She chose independent legal representation. She had lived with the defendant for more than one year at the time of her signing of the prenuptial agreement. Before the parties decided to marry, the plaintiff knew that the defendant would not consider remarriage without a prenuptial agreement in place. The plaintiff was well aware of the legal rights she was relinquishing. Her execution of the premarital agreement was knowing and voluntary.

### III

The plaintiff asserts that the defendant's failure to sign the premarital agreement prior to the marriage renders the contract invalid. The act defines "premarital agreement" as "an agreement between prospective spouses made in contemplation of marriage." General Statutes § 46b-36b (1). Although the definition does not specify that the agreement must be written, General Statutes § 46b-36c states that the agreement "shall be in writing and signed by both parties. . . ."

The act expressly shifts to the party, who questions the validity of the agreement, the burden of proving why the agreement should not be enforced. General Statutes § 46b-36g. That section does not specify as a reason for lack of enforcement a failure to sign the document by the party seeking to enforce it. The omission of such a ground for nonenforcement raises a question as to whether the requirement of § 46b-36c, that the agreement be in writing and signed by *both* parties, is mandatory or directory.

"[D]efinitive words, such as must or shall, ordinarily express legislative mandates of a nondirectory nature." (Internal quotation marks omitted.) *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 271, 777 A.2d 645 (2001). Yet in the context of time and notice requirements, the Connecticut appellate courts have often found the word "shall" to be directory rather than mandatory. See *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 692 A.2d 742 (1997); *Katz* v. *Commissioner of Revenue Services*, 234 Conn. 614, 662 A.2d 762 (1995). In particular, where a requirement is expressed in affirmative terms, unaccompanied by negative words, and there is no language that expressly invalidates any action taken after noncompliance with the statutory provisions, the Supreme Court has ruled

that statutory language should be construed as directory. *Katz* v. *Commissioner of Revenue Services*, supra, 617. Although the issue implicated by the construction of § 46b-36c is not one of deadlines for filing documents or proper procedures for giving notice, the issue is, nevertheless, procedural. The question is whether a signature on the document by the party seeking enforcement is essential to the purpose of the statute. "In order to determine whether a statute's provisions are mandatory [the courts] have traditionally looked beyond the use of the word 'shall' and examined the statute's essential purpose." *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 446, 685 A.2d 670 (1996).

It is a fundamental objective of the court to give effect to the intent of the legislature. "In seeking to discern that intent, [the court will] look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Doe* v. *Statewide Grievance Committee*, 240 Conn. 671, 680, 694 A.2d 1218 (1997). "[A] statute is not to be construed so as to thwart its [intended] purpose." *Narel* v. *Liburdi*, 185 Conn. 562, 571, 441 A.2d 177 (1981), cert. denied, 456 U.S. 928, 102 S. Ct. 1974, 72 L. Ed. 2d 443 (1982).

The wording of § 46b-36c is affirmative. Affirmative terms, unaccompanied by negative words, are an indication of directory intent rather than mandatory intent on the part of the legislature. *Doe* v. *Statewide Grievance Committee*, supra, 240 Conn. 681. "The test to be applied in determining whether a statute is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of

substance, the statutory provision is mandatory. If, however, the legislative provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory, especially where the requirement is stated in affirmative terms unaccompanied by negative words." (Internal quotation marks omitted.) *Lauer* v. *Zoning Commission*, 246 Conn. 251, 262, 716 A.2d 840 (1998).

The act contains no language expressly invalidating agreements that fail to comply with the dual signing provision. Although § 46b-36g sets forth four circumstances under which the agreement "shall not be enforceable,"[3] the lack of a signature by the enforcing party is not among those circumstances. When the statute itself recites no adverse consequence for failure to comply with a procedural matter, the legislative purpose may be deemed to be directory. *Katz* v. *Commissioner of Revenue Services*, supra, 234 Conn. 617; *Caron* v. *Inland Wetlands & Watercourses Commission*, 25 Conn. App. 61, 66, 592 A.2d 964 (1991), aff'd, 222 Conn. 269, 610 A.2d 584 (1992).

There is useful legislative history for the act. When the joint judiciary committee of the General Assembly held public hearings on March 17, 1995, the committee took testimony from Edith F. McClure of the family law committee of the Connecticut Bar Association. The family law committee of the Bar Association drafted the act. The statement of purpose from the family law committee of the Connecticut Bar Association began as follows: "The purpose of the proposed Act is to achieve by legislation a statement of public policy recognizing the efficacy of agreements for the management and control of property and personal rights and obligations of spouses. . . . The purpose of the Act is to

---

[3] In contrast to § 46b-36c, the nonenforceability section of the act is couched in the negative.

provide certainty as to the enforceability of the provisions in premarital agreements . . . ." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 7, 1995 Sess., p. 2492. "[T]estimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation. . . . This is because legislation is a purposive act . . . and, therefore, identifying the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question." (Internal quotation marks omitted.) *Dowling* v. *Slotnik*, 244 Conn. 781, 804, 712 A.2d 396, cert. denied sub nom. *Slotnik* v. *Considine*, 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 451 (1998).

"In determining whether the use of the word shall is mandatory or directory, the test is whether the prescribed mode of action is of the essence of the thing to be accomplished. . . . That test must be applied with reference to the purpose of the statute." (Internal quotation marks omitted.) *Sears, Roebuck & Co.* v. *Board of Tax Review*, 241 Conn. 749, 760, 699 A.2d 81 (1997). The signature of the party seeking enforcement of the terms of the contract is not a necessity. So long as he performs his obligations under the contract, his signature is superfluous from a practical point of view. In the present case, the defendant married the plaintiff. In so doing, he acted in reliance upon the plaintiff's signing of the premarital agreement. The certainty of enforceability purpose of the statute is achieved when the person who is disavowing the validity of the document has signed it intelligently and willingly. Having reaped the benefit of the signing, the plaintiff may not now disavow the burdens she assumed as her part of the contract. "One enjoying rights is estopped from repudiating dependent obligations which he has

assumed; parties cannot accept benefits under a con-
tract fairly made and at the same time question its
validity." *Schwarzschild* v. *Martin*, 191 Conn. 316, 321,
464 A.2d 774 (1983).

A colloquy that took place on the floor of the House
of Representatives on May 23, 1995, addressed issues
relating to technical noncompliance with the act as
opposed to substantive noncompliance. As the propo-
nent of the act, Representative Ellen Scalettar of the
114th assembly district responded, through Deputy
Speaker Wade A. Hyslop, Jr., to questions put by Repre-
sentative Richard O. Belden of the 113th assembly
district:

"[Representative Belden]: Mr. Speaker, just a ques-
tion, through you to the proponent please. Mr. Speaker,
with the enactment of this legislation, if somebody had
signed some other agreement or it didn't comply with
this statute, would it have the legal effect of a contract
anyway? Through you, Mr. Speaker. . . .

"[Representative Scalettar]: Through you, Mr.
Speaker. Yes, it would still be a valid contract. In fact,
the bill specifically provides in Section 10 that it will
not be deemed to affect the validity of any premarital
agreement made prior to the effective date of the
Act. . . .

"[Representative Belden]: Then, through you, Mr.
Speaker, how about a separate agreement made after
the effective date that did not entirely comply with the
legislation before us? . . .

"[Representative Scalettar]: Through you, Mr.
Speaker. I think the non-compliance would be subject
to interpretation by the courts in that circumstance.
The language is very broadly written. And I can't really
foresee a circumstance where this bill, if enacted, would
prevent enforcement of an agreement. . . .

"[Representative Belden]: Thank you, Mr. Speaker. What I'm attempting to get into the record here is whether this is a mandate that the only way you can have a premarital agreement in the state of Connecticut is by following this statute or whether or not two consenting adults following a standard contract type format could, in fact, enter into any type of agreement they care to and still be valid. And that's what I'm trying to get in the record, Mr. Speaker, through you to Representative Scalettar. If I perchance decided to, if for some reason, was single and decided to marry next year and entered into a contract that was different than the requirements of this file, would it be enforceable? Through you, Mr Speaker. . . .

"[Representative Scalettar]: Through you, Mr. Speaker. It's very difficult to answer in the abstract. I believe that most agreements would be enforceable because I can't, as I said, I can't really foresee circumstances where the conditions would be in such noncompliance as to render the agreement invalid. But, for example, if the agreement adversely affected the rights of a child, which is in violation of the statute, I do not believe that would be enforceable. It would depend on the actual terms of the agreement." 38 H.R. Proc., Pt. 9, 1995 Sess., pp. 3212–14.

Representative Belden used the word "mandate" to question whether the intent of the act was to supplant common-law premarital contracts or merely to steer the process into a standardized form. The discussion that took place on the floor of the House suggests that the legislature intended to do the latter. Shortly after the dialogue between Representatives Belden and Scalettar, the act passed the House with no dissenting vote.

The legislative history confirms that the purpose of the act is to recognize the legitimacy of premarital contracts in Connecticut, not to constrain such contracts

to a rigid format so as to limit their applicability. The legislature's use of the word "shall" in § 46b-36c is directory rather than mandatory as to the signature of the party seeking to enforce the premarital agreement. A signature by the party seeking to enforce the contract is a matter of convenience rather than a matter of substance. It is the signature of the party seeking to invalidate the force of the contract that is of the essence in order to assure enforceability.

The act was not enacted in derogation of the common law. Prior to the passage of the act, Connecticut had recognized the efficacy and usefulness of contracts between persons proposing to marry. See *McHugh* v. *McHugh*, supra, 181 Conn. 482. To interpret § 46b-36c as mandatory, as to the signature of the enforcing party, would impose a procedural burden upon premarital agreements that neither goes to the essence of the contracts nor serves any useful public policy. The defendant's signature on the premarital agreement was not required for the formation of the contract. Its absence from the contract is not a material omission. The parties intended to be bound by the terms of the premarital agreement regardless of the fact that the defendant had not signed the document.

## CONCLUSION

The plaintiff has shown that the defendant failed to deliver to her before the marriage a version or counterpart signed by the defendant. The plaintiff signed the premarital agreement before a notary on March 17, 1997. The defendant did not sign the premarital agreement prior to the marriage of the parties. The defendant demonstrated his acceptance of the premarital agreement by marrying the plaintiff on April 13, 1997. Since the court finds that the defendant acted in reliance upon the premarital agreement by marrying the plaintiff, the question of delivery of the contract to the plaintiff after signature by the defendant is moot. Delivery

of an original or counterpart of a prenuptial agreement to each signing party is not a requirement for validity under common law or under § 46b-36a et seq.

The plaintiff's claim that enforcement of the premarital agreement would be unconscionable has been reserved and will be addressed at the trial of the present case. The plaintiff executed a prenuptial agreement, after adequate financial disclosures, willingly and voluntarily. There was no coercion or undue influence. The defendant's failure to sign the contract prior to the marriage did not invalidate the contract. He assented to the bargain by marrying the plaintiff on April 13, 1997.

The plaintiff's motion in limine to preclude evidence of the parties' premarital agreement is denied.