# JOHN H. BRYCKI, SR. *v.* DONNA L. BRYCKI
## (AC 25594)

Lavery, C. J., and Dranginis and Harper, Js.

Argued May 26—officially released September 27, 2005

*Bruce A. Chamberlain*, for the appellant (plaintiff).

*William E. McCoy*, for the appellee (defendant).

*Opinion*

DRANGINIS, J. In this marital dissolution appeal, the plaintiff, John H. Brycki, Sr., challenges certain property distribution and financial orders entered by the trial court in its judgment dissolving the parties' marriage. On appeal, the plaintiff claims that the court improperly (1) awarded the defendant, Donna L. Brycki, the parties' quarry property and its mineral rights and (2) failed to award him any alimony. We affirm the judgment of the trial court.

The parties married in February, 1970. During the marriage, the plaintiff engaged in behavior the defendant deemed harmful to the marital relationship, including excessive drinking and gambling. The defendant, rather than seeking to dissolve the marriage, entered into an intimate relationship with another man. She

moved out of the marital home for four years, from 1996 until 2000, then returned in an attempt to reunite. The defendant, however, did not end her relationship with the other man, and she and the plaintiff did not resume marital relations.

The financial history between the parties is rather rocky. Throughout the marriage, the plaintiff has been employed primarily doing stone work, sometimes working for himself and sometimes working for others. He also has performed carpentry services to earn some extra income. Although the defendant originally stayed home to care for the parties' two children, she began working when their younger child was four years old. In 1980, the defendant obtained a job with the Electric Boat Division of General Dynamics Corporation, which became the primary source of the family's income. This job pays her approximately $45,000 a year. She also earns extra income in the form of rent from the parties' son, who currently resides at the house on the quarry property owned by the parties.[1] The plaintiff's estimate of his annual income is around $20,000, although he is unsure of his more recent earnings and had not filed tax returns for at least two years prior to trial.

The parties own two parcels of real property. The marital home, to which the court also referred as the "Black Ash property," is comprised of eight acres. The property is valued somewhere between $286,000 and $350,000[2] and is subject to a $67,000 mortgage. The property also was subject to a blanket mortgage of $325,000. The other parcel of property owned by the

---

[1] Although the rent was $232.56 per week, testimony at trial indicated that the parties' son would attempt to pay more than that amount each month, generally trying to pay as much of the $2800 mortgage payment on the property as possible.

[2] Both parties testified as to their opinion of the property's value. Neither party, however, consulted with or obtained an expert with regard to their valuation.

parties, the quarry property, consists of approximately forty acres and includes both a house and a quarry. The parties purchased the property in 2000 for $335,000, with the goal that the parties' son would live in the house on the property and that the plaintiff and his son would work the quarry under the business name of Bedrock Stone. The defendant paid $10,000 as a down payment, and the parties obtained a mortgage loan on the property for the remainder. This mortgage was the blanket mortgage also covering the Black Ash property. The parties differ vastly in their valuation of the quarry property, with the defendant valuing the property at the approximate purchase price and the plaintiff valuing the property at the purchase price plus an additional $1.2 million for the quarry alone. Their respective estimates are informed by the current price of seventy dollars per ton that purchasers of stone are paying and by a land surveyor's estimate that the quarry contains approximately 400,000 cubic yards of removable material. The land surveyor, however, was unable to say how much of the removable material was stone that could be sold for seventy dollars per ton or what the value was of the remainder of the removable material.

The court rendered judgment of dissolution in December, 2003, and entered some rather complex orders regarding the distribution of the marital property. Those orders relevant to this appeal required the defendant to refinance the quarry property so as to remove the blanket mortgage from the Black Ash property. If she were able to do so, the plaintiff was to quitclaim to the defendant all of his interest in the quarry property, and the defendant was to quitclaim to the plaintiff all of her interest in the Black Ash property. The court also ordered that each party retain respective separate bank accounts, retirement accounts and debts that were in his or her own name at the time of the dissolution. The plaintiff was to retain his business, and

no alimony was awarded to either party. The plaintiff has appealed to this court.

I

Prior to addressing the merits of the appeal, we must consider whether the parties' transfer of real property to each other by quitclaim deed, as ordered by the court, rendered this appeal moot. The defendant claims that because she had to refinance the quarry property in order to remove the blanket mortgage from the Black Ash property, a third party whose interests would be affected by further proceedings has been introduced in the form of the mortgagee. The plaintiff argues, however, that the transfer of the property has not rendered the appeal moot because the court, on remand, could order (1) the transfer of the property to either party pursuant to General Statutes § 46b-81, (2) the sale of the property, which would allow for the release of the mortgage or (3) the monetary equivalent of the property to the plaintiff. Because mootness implicates subject matter jurisdiction, it is a threshold issue for us to resolve. See *Ayala* v. *Smith*, 236 Conn. 89, 93, 671 A.2d 345 (1996).

"It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) *Connecticut Coalition Against Millstone* v. *Rocque*, 267 Conn. 116, 125–26, 836 A.2d

414 (2003). "The determination of whether a claim has become moot is fact sensitive . . . ." *Ayala* v. *Smith*, supra, 236 Conn. 94.

While this appeal was pending, the parties quitclaimed to each other the respective properties in accordance with the court's order. Contrary to the defendant's argument, however, this transfer does not render moot this appeal because there is practical relief that can be granted should the plaintiff prevail. As the plaintiff has argued, the court, on remand, could order the transfer of the properties from one party to the other or could order the sale of one or both properties to a third party. See General Statutes § 46b-81; *Falkenstein* v. *Falkenstein*, 84 Conn. App. 495, 501, 854 A.2d 749, cert. denied, 271 Conn. 928, 859 A.2d 581 (2004). Because there exists practical relief that can be granted to the plaintiff should he prevail, the appeal is not moot.[3]

II

The plaintiff first claims that the court improperly awarded the quarry property to the defendant. He breaks this claim into three separate arguments: (1) the court's award contravened the agreement reached by the parties during trial that they would share the quarry property and its mineral rights; (2) the court's award was improper because the defendant failed to list on her financial affidavit any value for the quarry property; and (3) the court abused its discretion in making the award because it gave to the defendant a substantial income producing asset. We discuss each of the plaintiff's arguments in turn.

[3] We also note that in addition to challenging the court's award of the quarry property to the defendant, the plaintiff has challenged the court's failure to award him any alimony. Because that challenge is not linked directly to the award of the quarry property, that issue raised by the plaintiff would not be moot, even if we were to conclude that the portion of the appeal challenging the award of the quarry property to the defendant was moot.

A

During cross-examination, the defendant testified that she would not object to the selling of the mineral rights to the quarry property and the splitting with the plaintiff any profit that remained after paying off the mortgage on the quarry property. Following this testimony, the plaintiff ceased his cross-examination of the defendant. On redirect examination, the defendant testified that she wanted to retain the real estate of the quarry property and that if there was no buyer or if it was not possible to sell only the mineral rights in the property, she wanted to run the quarry. The defendant thereafter submitted a trial memorandum to the court that included proposed orders. The defendant requested that the court award her the quarry property and award the Black Ash property to the plaintiff, with a mortgage on the Black Ash property in the amount of $140,000 given to the defendant.

The court, in its memorandum of decision, noted that the defendant had testified that she would be willing to sell the mineral rights to the quarry property but also noted that it was unclear from the testimony of the parties whether they both would be willing to sell the quarry itself. It also is noteworthy that even though the court ordered the parties to obtain an opinion from the zoning officer as to whether the quarry property could be subdivided, no evidence ever was offered on this point.

The plaintiff contends that the defendant's testimony that she would not object to the selling of the mineral rights to the quarry property and the splitting of the profit from such a sale with him constituted an in-court settlement agreement that essentially required the court to enter orders in accordance with that testimony. The defendant argues that the testimony on which the plaintiff relies has been taken out of context because the

defendant also testified that she wanted to retain the quarry property and that even if the testimony could be considered a settlement offer, such an offer could not be a binding agreement without the court's independent evaluation of the agreement for fairness and equity, as required by General Statutes § 46b-66. We agree with the defendant.

In oral argument, the plaintiff relied heavily on our Supreme Court's decision in *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, 225 Conn. 804, 811, 626 A.2d 729 (1993), for the proposition that the trial court has the inherent power to enforce a settlement agreement. The plaintiff's entire argument, however, requires as a predicate an agreement between the parties that neither would continue to seek sole ownership of the quarry property, but rather that both would seek to sell the mineral rights to that property and share with each other any profit made from that sale. The plaintiff claims that evidence of such an agreement can be found in the defendant's testimony on cross-examination. Such evidence, however, is not undisputed and, accordingly, the terms of any claimed settlement agreement likewise is in dispute. Not only is any claimed settlement agreement rendered unclear by the defendant's contrary testimony on redirect examination, the court also concluded that it was unclear whether both parties would consent to the sale of the mineral rights. It is axiomatic that where no settlement agreement exists, there is no obligation on the court to enforce an agreement.

Even if the defendant's testimony on cross-examination could be considered an offer and the plaintiff's refraining from continuing cross-examination on that matter could be considered an acceptance of that offer, we still conclude that the plaintiff's reliance on *Audubon Parking Associates Ltd. Partnership* is misplaced. First, neither the plaintiff nor the defendant requested

that the court evaluate this agreement in accordance with § 46b-66, a requirement peculiar to settlement agreements in the area of family law. Without a separate evaluation by the court to determine whether the agreement was fair and equitable, it could not become a settlement agreement as to the parties regarding their marital property, and the court was free to distribute the property in a manner that it determined was fair and equitable. General Statutes § 46b-66 (a). Second, *Audubon Parking Associates Ltd. Partnership* and its progeny all involve settlement agreements that parties have reached outside of court and with the advice of counsel. See, e.g., *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 811; see also *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, 260 Conn. 598, 609–10, 799 A.2d 1027 (2002); *DAP Financial Management Co.* v. *Mor-Fam Electric, Inc.*, 59 Conn. App. 92, 94, 755 A.2d 925 (2000); *Sicaras* v. *Hartford*, 44 Conn. App. 771, 775, 692 A.2d 1290, cert. denied, 241 Conn. 916, 696 A.2d 340 (1997). We are unwilling to extend the rule in *Audubon Parking Associates Ltd. Partnership* to representations made by a party witness under the inquiry of cross-examination and where the witness has had no opportunity to consult privately with her attorney regarding the legal consequences of those representations.[4] We also conclude that such representations fail to meet the minimum requirements of *Audubon Parking Associates Ltd. Partnership* in that both parties did not assent in open

[4] We in no way are suggesting that a crafty cross-examination cannot elicit from a witness representations of fact that may impact the court's final judgment. Such representations are part and parcel of any trial. Those factual representations, however, differ from the type of legal representation the plaintiff claims to have elicited from the defendant here. The plaintiff's claim, with which we disagree, is that, separate from any discussion with counsel and regardless of any prior stance taken at trial, the defendant, on the witness stand and under cross-examination, could have agreed to waive her right to a trial on the issue of the distribution of the quarry property.

court to each provision of the claimed agreement. See *Sicaras* v. *Hartford*, supra, 777–78. We therefore find unavailing the plaintiff's first argument, which is that the court's award of the quarry property to the defendant was not in accordance with the parties' agreement to sell the mineral rights to the property.

B

The plaintiff also argues that the court improperly awarded the defendant the quarry property because she failed to list the value of the quarry on her financial affidavit and thereby attempted to commit a fraud on the court. The plaintiff's argument goes to the heart of the disagreement between the parties respecting the value of the quarry property. The plaintiff, on his financial affidavit, listed the value of the quarry property as two separate properties: The acreage comprising the actual quarry and the remainder of the property, including the house. The plaintiff valued the house at $335,000, which was the purchase price of the property. The plaintiff valued the quarry at $1.2 million. He reached this figure by estimating the amount of removable stone in the quarry, the projected purchase price of that stone and the costs of removing the stone. The defendant, on her financial affidavit, valued the quarry property as one parcel, and she valued it at $325,000. The defendant testified that her valuation *included both the quarry and the remainder of the property*, and she indicated that she did not know whether there was any independent value in the mineral rights to the quarry property. The defendant reached her valuation figure from the purchase price of the property and her understanding that, at the time of the purchase, there were no higher bidders for the quarry property.

In light of the evidence presented to the court, the plaintiff's claim that the defendant failed to list a value for the quarry on her financial affidavit is without merit.

What the plaintiff actually argues is that the defendant undervalued the property and that the court improperly accepted her valuation of the property rather than his. Because this argument implicates the factual basis of the plaintiff's third argument, we will discuss them together.

C

The value placed on the quarry property by the court is a question of fact that we will not overturn unless clearly erroneous. See *Provenzano* v. *Provenzano*, 88 Conn. App. 217, 222, 870 A.2d 1085 (2005). "A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . Simply put, we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) Id.

In its memorandum of decision, the court did not indicate what value it placed on the quarry property. When the court ruled on the plaintiff's motion for articulation, however, it indicated that in distributing the parties' assets, it had attempted to make a fairly even division and that it had not accepted the plaintiff's valuation of the quarry property at $1.2 million. Rather, the court attempted to split the difference between the value placed on the property by the plaintiff and the value placed on it by the defendant. Specifically, the court stated: "[I]t's my recollection . . . that this was a fairly even distribution because of the existence of the $350,000 mortgage that would still remain on the [quarry] property. And my recollection is that . . . [the] Black Ash property was . . . worth over $300,000, so that would give him an equity of over

$200,000. And I don't know what the [quarry] property, no one seems to know what that's worth . . . if it's worth $600,000 and she has a $350,000 mortgage, she's only getting $250,000. So, to me that seems like a pretty even distribution of the marital assets."

Although it would have been preferable for the court to place a more specific value on the quarry property, in light of all the evidence adduced at trial, we can find no fault with the court's failure to do so. On the first day of trial, when both the plaintiff and the defendant testified as to the value each placed on the quarry property, the court repeatedly stated that it needed more information, and preferably an expert opinion, regarding the quarry property's value.[5] The court also found the plaintiff's valuation of the property disingenuous in light of the fact that (1) the parties were the highest bidders when the property was sold on the open market and (2) the plaintiff, in order to obtain the property without putting it up for sale, was willing to pay the defendant only $135,000 for her share. Furthermore, although the plaintiff claimed that the quarry property was worth upward of $1 million, he either was unable or unwilling to pay $5000 for an appraisal of the property.

Several months later, on the second scheduled day of trial, the plaintiff presented as a witness a land surveyor who, in 2000, had estimated the quantity of removable material in the quarry for the plaintiff and his son to obtain a zoning permit to work the quarry. The land surveyor testified that there were approximately

---

[5] For example, the court stated: "What I am trying to tell you is this: If you expect me to put a value on this quarry by virtue of this testimony, I am not qualified to do that. . . . I don't know that there is anybody here who is so qualified; there are so many variables."

The court also stated: "I can't make a decision of the assets between these two people unless I know what I am dividing. . . . I don't see that this is a situation where the property should be divided anything but equal. . . . So, I can't decide what is equal unless I have a good idea of what the value of this quarry is . . . ."

400,000 cubic yards of removable material, but he was unable to testify as to the weight of the removable material or what comprised the removable material. He testified that even though soil testing showed that there was stone in the quarry, it was not possible to determine whether the amount of stone in the quarry made up a majority of the removable material. Because he could not determine what material was in the quarry, the land surveyor testified that he was unable to reach a conclusion regarding the value of the removable material.[6]

After the land surveyor testified but prior to the close of the plaintiff's evidence, the court indicated that it had not received from the land surveyor a sufficient estimate of the quarry's worth in order to place a value on the property. Specifically, the court stated that the land surveyor's testimony did not "indicate any value of" the property. Thereafter, without presenting any more expert testimony regarding the value of the quarry, the plaintiff rested.

The court gave the plaintiff and the defendant ample opportunity to provide it with evidence of the property's value. The parties failed to do this, and so the court estimated a value of the property for purposes of distributing the marital assets. This estimate was not without reason or basis in the evidence that the court *did have* before it. We cannot say, therefore, that the court's finding that the property's value was about $600,000 was clearly erroneous.

Having concluded that the court's factual findings were not clearly erroneous, we likewise conclude that the court's relatively equitable division of the parties'

---

[6] The court also heard testimony that the permit that the parties had obtained to allow them to remove material from the quarry was a five year renewable permit, which was not renewable automatically, but was subject to the discretion of the town.

real property was not an abuse of discretion.[7] The plaintiff's contrary claim, that the court's award of the quarry property to the defendant was an inequitable distribution of the marital assets, is without merit in light of the court's factual findings regarding the property's value and the failure of the plaintiff to provide evidence establishing as fact the value that he placed on the property.

### III

The plaintiff's final claim on appeal is that the court improperly failed to award him any alimony after it had awarded the quarry property, the parties' substantial asset, to the defendant. This claim lacks the very factual foundation it asserts—that the quarry property was *the* substantial asset of the parties. As indicated, the court considered the distribution of the Black Ash property to the plaintiff and the quarry property to the defendant to be an even division of the marital assets. The plaintiff's claim, however, also rests on other, uncontested evidence presented at trial, namely, that the defendant's earnings served as the parties' primary income, that the defendant provided the plaintiff with medical and dental insurance and that the defendant had the more substantial retirement account.

In its memorandum of decision, the court noted that it had considered all the provisions of the pertinent statutes, although it did not cite specifically to General Statutes § 46b-82, which permits the court to order either or both parties to pay alimony in applicable situations. The court found both parties equally at fault for the breakdown of the marriage and distributed the parties' property, with the Black Ash property being

---

[7] Trial court orders in family relations cases will not be disturbed on appeal unless the court has abused its discretion. *Chyung* v. *Chyung*, 86 Conn. App. 665, 667, 862 A.2d 374 (2004), cert. denied, 273 Conn. 904, 868 A.2d 744 (2005).

awarded to the plaintiff and the quarry property to the defendant. The court ordered that all accounts, including retirement accounts, were to be retained by the party in whose name the account was maintained. The court did not make any award with respect to alimony or medical benefits. The court also did not make any specific findings regarding the earning capacity of either party or the estate needs of either party, both of which may be considered under § 46b-82.

Following the court's decision but prior to the filing of this appeal, the plaintiff filed a motion for articulation, in which he requested that the court clarify whether it had made any orders regarding alimony. The court denied the plaintiff's motion. Thereafter, the plaintiff filed an appeal with this court and also filed a motion for review of the court's denial of his motion for articulation. We dismissed the plaintiff's motion for review. The plaintiff did not file a motion for articulation pursuant to Practice Book § 66-5 once the appeal had been filed.

We first note that the trial court's memorandum of decision does not contain explicit or in-depth reasoning for its financial orders, and, therefore, the plaintiff has provided this court with an inadequate record to review his claim. Because the plaintiff filed a motion for articulation with the trial court and a motion for review with this court, we take this opportunity to clarify our procedures for reviewing a trial court's denial of a motion for articulation.

Our rules of practice provide a procedure for appellants seeking an articulation from the trial court as to the factual and legal bases for its decisions. Practice Book § 66-5. If the trial judge denies the motion for articulation, the appellant has a remedy by way of motion for review, which may be filed with this court pursuant to Practice Book § 66-7. This motion for review specifically can be utilized *only for those*

*motions for articulation filed pursuant to § 66-5.* See Practice Book § 66-7. Section 66-5 of our rules of practice provides in relevant part: "Any motion for . . . articulation shall be filed within thirty-five days after delivery of the last portion of the transcripts or, if none, after the filing of the appeal, or, if no memorandum of decision was filed before the filing of the appeal, after the filing of the memorandum of decision. . . ." That language of Practice Book § 66-5 makes clear that the motions for articulation under that section may be filed only after the filing of an appeal. See also *Matka Corp.* v. *Automated Material Handling, Inc.*, 34 Conn. App. 723, 724 n.1, 643 A.2d 276 (1994) ("motion for review may be filed with this court pursuant to Practice Book § 4054 [now § 66-7] after taking a timely appeal, provided the motion for articulation was filed after the appeal was taken"). Because the plaintiff's motion for articulation was filed and denied by the trial court prior to the plaintiff's filing his appeal, he could obtain no relief by way of a motion for review of that denial. In order to obtain relief by this court ordering the trial court to articulate its decision regarding alimony, the plaintiff would have had to file another motion for articulation, this one pursuant to Practice Book § 66-5, once he had filed his appeal. He failed to do so and left this court with a record that is inadequate for resolution of his claim.[8]

The judgment is affirmed.

In this opinion the other judges concurred.

[8] We in no way mean to imply that, had the plaintiff provided this court with an adequate record, he would have prevailed on this claim. We note that the court had before it much testimony regarding the financial contributions made by the defendant during the course of the marriage and the financial irresponsibility of the plaintiff, including his inability to estimate his annual income of the past two years. For this court to conclude, however, that those representations guided the court's decision regarding alimony would be pure speculation. It is exactly that type of speculation that the motion for articulation and the motion for review are designed to eliminate. See *Gladstone, Schwartz, Baroff & Blum* v. *Hovhannissian*, 53 Conn. App. 122, 127, 728 A.2d 1140 (1999).