MELINDA CREWS *v.* STEPHEN L. CREWS
(AC 26996)

Gruendel, Lavine and Stoughton, Js.

Argued October 23, 2007—officially released April 29, 2008

*George J. Markley*, with whom was *Michael A. Meyers*, for the appellant (defendant).

*Charles D. Ray*, with whom, on the brief, was *Kellyanna Johnson*, for the appellee (plaintiff).

*Opinion*

LAVINE, J. This case highlights the difference between dissolution actions that proceed in equity and those subject to an antenuptial agreement entered into before 1995, which are adjudicated under principles of contract law. On appeal, the defendant, Stephen L. Crews, claims that the trial court improperly (1) failed to enforce the terms of the parties' antenuptial agreement (agreement), (2) ordered him to maintain a life insurance policy in the amount of $1.5 million, (3) ordered him to make certain periodic payments and (4) made clearly erroneous factual findings. We agree that the court improperly failed to enforce the agreement and thus reverse, in part, the judgment of the trial court.

The plaintiff, Melinda Crews, initiated this action in May, 2004. In her one count complaint, the plaintiff alleged the date of the parties' marriage, that there were two minor children of the marriage and that the marriage had broken down irretrievably, in addition to the necessary jurisdictional allegations. In her prayer for relief, the plaintiff asked for a dissolution of marriage, alimony, child support, sole custody of the minor children, assignment of the defendant's interest in 3 Fairview Drive, Westport (marital home), an equitable division of the marital assets, attorney's fees and such other relief as the court deemed fair and equitable.

The defendant filed an answer and a two count cross complaint on April 18, 2005. The defendant admitted all of the allegations of the plaintiff's complaint. The allegations of count one of the defendant's cross complaint essentially mirrored the allegations of the plaintiff's complaint. In count two, the defendant alleged that the parties validly and voluntarily had entered into the agreement on June 24, 1988, following full disclosure of their individual financial affairs. He also alleged that at the time the agreement was signed, each of the parties was represented by independent counsel. Furthermore, he alleged that the circumstances of the parties at the time of dissolution were not so beyond their contemplation on June 24, 1988, that enforcement of the agreement would cause an injustice. With respect to count one, the defendant sought a dissolution of the parties' marriage, joint custody of the minor children, an assignment of so much of the plaintiff's estate as the court deemed reasonable and proper and such other relief consistent with equity and good conscience. As to court two, the defendant prayed for a dissolution of the parties' marriage, joint custody of the parties' minor children and enforcement of the agreement. The plaintiff admitted in her answer to the cross complaint that the parties had signed the agreement but denied the remainder of the allegations of count two.

After the parties presented evidence in June, 2005, the court recounted the following evidence relevant to the issues on appeal. The parties met at a corporate outing when they both were employed by the General Electric Corporation (General Electric). At the time, the defendant was the divorced father of three children. The plaintiff had not been married previously. The defendant holds a bachelor's degree; the plaintiff has bachelor's and master's degrees. The defendant was then residing in the future marital home, a house that he had purchased from his mother in an arm's-length

transaction on December 31, 1986. The plaintiff owned a condominium unit in Bridgeport. At the time, each of the parties had bank accounts, pension plans and investments.

The parties became engaged in January, 1988, and were married on June 25, 1988. About one year prior to their wedding, the defendant raised the subject of an antenuptial agreement. The defendant believed he had been "burned" in his previous divorce and declared: "No agreement; no wedding!" The plaintiff told the defendant that she was "no fan, but agreed with him in concept." The defendant described the agreement as a precondition to the wedding itself and presented the plaintiff with a draft of the agreement on May 31, 1988. The parties signed the agreement on June 24, 1988, one day before they were married.

Following their marriage, the parties resided in the marital home and had two children, a daughter born in May, 1989, and a learning disabled son born in May, 1992. Both parties were employed during their marriage, and initially each of them traveled extensively in connection with his or her employment. At the time of trial, the defendant had been employed by General Electric for thirty-nine years, where he earned an annual base salary of $131,000[1] and regularly received annual bonuses. His annual net income was $98,540 at the time of dissolution. The court made no finding that the nature of the defendant's employment changed during the marriage from what it had been prior to the marriage. During the marriage, he also acquired General Electric stock and stock options, some of which was encumbered by margin loans. He also participated in two executive compensation plans in the 1990s.

The plaintiff was fifty-three at the time of dissolution. From 1981 through 1986, she was a technical writer

---

[1] The defendant testified that his base salary in 1988 was $88,000.

for General Electric, earning $50,000 per year. She left General Electric to join Practice Media and later the NYNEX Corporation. She worked steadily during the marriage, except for a three month maternity leave she took following the birth of each child. After the birth of the parties' children and an automobile accident, the plaintiff decided that corporate travel was too much for her in addition to her responsibilities at home. In 1993, she formed her own business known as M. Crews & Company, LLC, which she operated out of the marital home until just prior to trial. The value of the plaintiff's business then was about $96,000, and she had an annual net income of $69,056.

The court found that the parties drifted apart over time and that both of them contributed to the disintegration of the marriage, but that the defendant bore a greater share of the blame for the breakdown because he "set the tone" for the marriage. He set the tone *"starting with the antenuptial agreement"*; (emphasis added); segregating assets, particularly the marital home, and by imposing a "heavy double burden" on the plaintiff to obtain gainful employment and to maintain the household, including primary responsibility for the children.

The court rendered judgment of dissolution by way of a memorandum of decision filed August 16, 2005.[2] Pursuant to a motion to open, reargue and clarify filed by the defendant on August 25, 2005, the court issued an amendment to the memorandum of decision on September 19, 2005.

---

[2] The court incorporated the parties' stipulated parenting agreement in its judgment. The parties also stipulated that as an intact family, they would have sent both children to college. The court found the stipulation sufficient to bring the postsecondary education of the children within General Statutes § 46b-56c. Our decision does not affect either of those aspects of the judgment.

The court ordered the defendant to pay the plaintiff $1000 per month as nonmodifiable periodic alimony until the death of either party, the remarriage of the plaintiff or August 31, 2010, whichever occurred first, as well as $1439 monthly child support until the older child reached the age of eighteen at which time child support was to be adjusted in accordance with the child support guidelines or as the court may direct. The defendant also was ordered to maintain and pay for health insurance for each of the minor children as long as he is obligated to pay child support for the child. The court awarded the defendant exclusive possession of the marital home as of November 1, 2005, but ordered him to pay the plaintiff $450,000, nontaxable to her, for her contribution to the appreciation of the family home and a portion of his General Electric and SunW stock acquired since the time of the marriage. The defendant was ordered to maintain $1.5 million of existing life insurance, naming the plaintiff and the minor children as equal beneficiaries as long as he is obligated to pay alimony or child support. In addition, the court ordered the defendant to pay the plaintiff $25,000 for attorney's fees related to this action.

The court awarded the plaintiff a portion of the defendant's pension, deferred income and investment programs and permitted her to retain all of her own investments and pension plans, as well as her business and condominium. The parties retained their personal bank accounts. Additional facts will be discussed where necessary.

Although it is a creature of statute, generally speaking, a dissolution action is equitable in nature. See *Loughlin* v. *Loughlin*, 280 Conn. 632, 641, 910 A.2d 963 (2006). "The power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a

marriage. . . . [I]n the exercise of its inherent equitable powers it may also consider any other factors [besides those enumerated in the statutes pertaining to dissolution] which may be appropriate for a just and equitable resolution of the marital dispute. . . . [I]n . . . questions arising out of marital disputes, this court relies heavily on the exercise of sound discretion by the trial court. . . . A less deferential standard applies, however, when the decision of the trial court is based not on an exercise of discretion but on a purported principle of law." (Citations omitted; internal quotation marks omitted.) Id. "An antenuptial agreement is a type of contract and must, therefore, comply with ordinary principles of contract law." *McHugh* v. *McHugh*, 181 Conn. 482, 486, 436 A.2d 8 (1980). "[A]ntenuptial agreements are to be construed according to the principles of construction applicable to contracts generally. The basic purpose of construction is to ascertain and give effect to the intention of the parties." (Internal quotation marks omitted.) Id., 491.

I

The defendant's first claim is that the court improperly failed to enforce the terms of the agreement.[3] We agree.

---

[3] The agreement is straightforward and blunt. The preamble of the agreement states in part: "WHEREAS, the parties desire to make provisions now to assure that in the event of a dissolution of the marriage, for any reason, including death of the parties, each of them shall have certainty as to their rights, entitlements and obligations . . .

"WHEREAS each party affirms to the other his or her respective ability now and in the future to be gainfully employed and/or their respective ability and obligation to protect themselves from involuntary or voluntary termination of employment including long term disability . . .

"WHEREAS, except as otherwise provided herein, [the defendant] desires to keep all of his property, now owned or hereafter acquired, free from any claim that [the plaintiff] might otherwise acquire by reason of the marriage, any dissolution thereof and/or by reason of her surviving him as his widow . . .

"WHEREAS, except as otherwise provided herein, [the plaintiff] desires to keep all of her property, now owned or hereafter acquired, free from any

The following facts are relevant to this issue. The court found, on the basis of the testimony of the parties and the attorneys who represented them at the time the agreement was signed, that the defendant raised the subject of an antenuptial agreement at least one year before the parties' wedding. He presented the plaintiff with a draft of the agreement on or about May 31, 1988. The plaintiff sent a copy of the draft agreement to her attorney, Candace Page, prior to going on a business trip to Singapore, indicating that she would meet with Page when she returned. Page met with the plaintiff on June 21, 1988, and strongly recommended that the plaintiff not sign the agreement.[4] Although the plaintiff was uncomfortable with the agreement, she said that she signed it the day before the wedding because she " 'made a commitment.' "[5]

---

claim that [the defendant] might otherwise acquire by reason of the marriage, any dissolution thereof and/or by reason of his surviving her as his widower . . . ."

[4] At trial, Page testified in part as follows:

"[The Plaintiff's Counsel]: Was there a reason that you did not acknowledge her signature?

"[The Witness]: Yes.

"[The Plaintiff's Counsel]: Why?

"[The Witness]: I was so uncomfortable with her doing this, and I had such objections to her doing this, she was going to do it anyway. I was uncomfortable taking her acknowledgement.

\* \* \*

"[The Plaintiff's Counsel]: Was it unusual to retain a prenuptial file for eighteen years?

"[The Witness]: It was unusual for me to keep this file, which I kept at home with my private files separated from my normal work files, because this file had bothered me so much. I did not keep it at the office. I've worked at three different offices . . . and I have still kept this file.

"[The Plaintiff's Counsel]: Why?

"[The Witness]: It so disturbed me as to what was going on that I wanted to make sure that I had it in case it was ever needed, and the documents in it."

[5] In early July, 1988, the plaintiff, however, wrote a self-serving letter for the file that at the time she signed the agreement, she was suffering from an illness she had acquired in Singapore and that she was taking over-the-counter medicine to get through the wedding and reception.

Moreover, the court found that at the time the parties signed the agreement, each of them had had the benefit of independent counsel of his or her own choosing, the defendant had disclosed his significant assets, the plaintiff had failed to disclose her assets and liabilities, and each party had ample opportunity to discover the financial circumstances of the other party and, in fact, knew of the other's financial circumstances.[6] The court found that other than the usual stress of a wedding, there was no coercion or duress imposed on the plaintiff. The court further found that the agreement contains no provision that either shocks the conscience or violates public policy and that it was enforceable at the time of its execution.[7]

The court found, however, that the economic circumstances of the parties had "changed dramatically" between the time the agreement was signed and the dissolution, particularly the economic circumstances of the defendant, due in substantial part to the plaintiff's efforts. In view of the substantial financial and nonfinancial contributions the plaintiff made from her employment outside of the home and her parenting and homemaking efforts, the court concluded, citing *McHugh* v. *McHugh*, supra, 181 Conn. 482, that it would be inequitable to enforce the terms of the agreement. In

[6] The court found that the agreement was not subject to the provisions of General Statutes § 46b-36a et seq., the Connecticut Premarital Agreement Act (act). The act pertains to antenuptial agreements entered into on or after October 1, 1995, and provides, inter alia, that a premarital agreement shall not be enforceable if the party against whom enforcement is sought proves the agreement was not entered into voluntarily, the agreement is unconscionable, there was no fair and reasonable disclosure of financial assets and obligations and such party was not able to consult with independent counsel. See *Friezo* v. *Friezo*, 281 Conn. 166, 182, 914 A.2d 533 (2007).

[7] On appeal, neither party challenges the court's findings that the parties validly entered the agreement and that its terms do not violate any statute or public policy. Those findings, therefore, are res judicata. See *Jefferson* v. *Commissioner of Correction*, 99 Conn. App. 321, 324, 913 A.2d 491, cert. denied, 281 Conn. 928, 918 A.2d 277 (2007).

rendering its judgment, the court awarded the plaintiff alimony, attorney's fees and a portion of the defendant's assets. The court awarded the plaintiff time limited alimony on the basis of statutory factors, namely, the age, education, earnings and employment history of the plaintiff. See General Statutes § 46b-82. The court also ordered the defendant to pay the plaintiff a lump sum distribution of $450,000 and portions of his investments and pension plans.

The defendant claims that the court's financial orders violated the agreement. When an appellant's claim alleges that the facts found by the court were insufficient to support its legal conclusions, we are presented with a mixed question of fact and law to which the plenary standard of review applies. See *Friezo* v. *Friezo*, 281 Conn. 166, 180, 914 A.2d 533 (2007); *Winchester* v. *McCue*, 91 Conn. App. 721, 726, 882 A.2d 143, cert. denied, 276 Conn. 922, 888 A.2d 91 (2005). Our task is to determine whether the court's conclusions are legally and logically correct and find support in the facts that appear in the record. See *Friezo* v. *Friezo*, supra, 181.

First, we examine the relevant sections of the agreement. Because the agreement is a contract, the principles of contract law apply. *McHugh* v. *McHugh*, supra, 181 Conn. 486. "In giving meaning to the terms of a contract, the court should construe the agreement as a whole, and its relevant provisions are to be considered together. . . . The contract must be construed to give effect to the intent of the contracting parties. . . . This intent must be determined from the language of the instrument and not from any intention either of the parties may have secretly entertained. . . . [I]ntent . . . is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . When the

language is clear and unambiguous, however, the contract is to be given effect according to its terms." (Internal quotation marks omitted.) *Phillips* v. *Phillips*, 101 Conn. App. 65, 74, 922 A.2d 1100 (2007). Neither party contends that any of the terms of the agreement are ambiguous, and the court made no such finding.

The preamble to the agreement sets forth the purpose of the agreement, i.e., to make provision in the event of a dissolution of marriage. The parties desired to segregate their individual property owned prior to and during their marriage and to affirm their individual abilities to hold gainful employment then and in the future. See footnote 3. As noted, the court awarded the plaintiff time limited alimony, attorney's fees, a lump sum property settlement of the marital home and portions of the defendant's investments and pension plans. Section 3.1 of the agreement addresses the issue of alimony in the event of a dissolution of marriage, stating in relevant part that "neither party shall seek for himself or herself, or accept from the other, any cash or other property, whether as pendente lite or permanent alimony . . . ."[8] Article III anticipated the possibility of an action for the dissolution of marriage. Section 3.2 states in relevant part that "each party shall be entitled to receive, as and for a property settlement, his or her share of the Marital Property (as defined below) in proportion with his or her contribution to the Marital Property, and all of his or her Separate Property (as defined below)."[9] Given the plain meaning of the relevant terms

[8] Section 3.1 also contains language that one party would not seek or accept from the other "any cash or other property, whether as . . . attorney's fees, or for any purpose whatsoever relating to the dissolution proceedings."

[9] Marital property and separate property are defined by the following sections of the agreement:

"3.3 'Marital Property' shall consist of all property owned, acquired, or accrued, directly or indirectly, by the parties during the marriage, other than the property defined below as Separate Property.

"3.4 'Separate Property' shall include all property owned by either party prior to the marriage, and all property received by either party as a gift or

of the parties' agreement, we conclude that the court's awarding the plaintiff time limited alimony, attorney's fees, a lump sum property settlement and portions of the defendant's assets is contrary to the terms of the agreement, unless one of the *McHugh* factors dictates otherwise.

"The validity of an antenuptial contract depends upon the circumstances of the particular case. . . . Antenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) its terms do not violate statute or public policy; and (3) the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice. [*McHugh* v. *McHugh*, supra, 181 Conn. 485–86]." (Internal quotation marks omitted.) *Winchester* v. *McCue*, supra, 91 Conn. App. 725. The court found that the agreement conformed to the first two prongs of *McHugh*, but concluded that, under the third prong, it would be inequitable to enforce the agreement.

"[A]n antenuptial agreement will not be enforced where the circumstances of the parties at the time of the dissolution *are so far beyond the contemplation of the parties at the time the agreement was made as to make enforcement of the agreement work an injustice.* . . . Thus, where a marriage is dissolved not because it has broken down irretrievably, but because of the

inheritance at any time. Any property that shall originally be considered Separate Property shall continue to be so treated, including any appreciation in value of such property, income produced by such property, proceeds of the sale of such property, or the appreciation, income, or proceeds of any such proceeds, for as long as such property shall be segregated from the Marital Property or the Separate Property of the other."

fault of one of the parties, an antenuptial waiver of rights executed by the innocent party may not be enforceable, depending upon the circumstances of the particular case and the language of the agreement. . . . Likewise, *where the economic status of parties has changed dramatically between the date of the agreement and the dissolution, literal enforcement of the agreement may work injustice.* Absent such unusual circumstances, however, antenuptial agreements freely and fairly entered into will be honored and enforced by the courts as written."[10] (Citations omitted; emphasis added.) *McHugh* v. *McHugh*, supra, 181 Conn. 489.

On the basis of our review of the evidence at trial, we conclude that the only *McHugh* factor on which the court decided not to enforce the agreement was its finding that there was a dramatic change in the economic circumstances of the parties between the time they signed the agreement and the dissolution of their marriage. This conclusion is not supported by the facts in the record or the reasonable inferences to be drawn therefrom. We conclude as well that the court's finding that the changed circumstances were beyond the contemplation of the parties at the time they signed the agreement also is not supported by the record.

---

[10] The trial court's findings make it unnecessary for this court to consider the causes of the breakdown of the marriage. The court's third finding in its memorandum of decision states in part "[t]hat the marriage of the parties has broken down irretrievably, and that ample evidence exists that *both parties have contributed to said breakdown.*" (Emphasis added.) The plaintiff herself admitted that she contributed to the breakdown of the marriage. Moreover, being worked to a "frazzle," as stated by the court, is not the legal fault *McHugh* requires to overcome the terms of the agreement. *McHugh* v. *McHugh*, supra, 181 Conn. 490 ("court's conclusion that the parties' marriage had broken down irretrievably indicates that the marriage had ended without the legal fault of either party"). Importantly, we have noted that both parties alleged that the marriage had broken down irretrievably, and neither one of them alleged legal fault in seeking a dissolution of the marriage.

The agreement states in relevant part that "each party affirms to the other his or her respective ability now and *in the future to be gainfully employed* and/or their respective ability and obligation to protect themselves from involuntary or voluntary termination of employment including long term disability."[11] (Emphasis added.) Article IV of the agreement also indicates that the parties contemplated having children at the time it was signed.[12] By signing the agreement, the plaintiff also recognized that the defendant desired to segregate all of his property from any interest she may have had in it.[13]

The evidence demonstrates that the parties contemplated the possibility of a divorce proceeding and incorporated provisions in the agreement to cover such an eventuality and agreed on how to protect their respective assets.[14] Furthermore, there is no evidence to suggest that the parties' financial circumstances at the time of dissolution, relatively speaking, were anything other than what they contemplated when they signed the agreement.

[11] The court found that "during the early years, the marriage was a partnership between two hardworking, career oriented people with demanding jobs and that when the children came along, the [plaintiff] assumed the primary homemaking duties as well . . . ."

[12] Section 4.1 of the agreement states in part: "This agreement shall in no way limit, reduce, or qualify either party's legal obligation to support his or her children who are issue of the marriage."

Section 4.2 of the agreement states that the defendant "hereby represents that it is his intention to treat any children of the marriage of the parties herein in the same manner as the children of his prior marriage."

[13] The language of the agreement is stark. When she signed the agreement, the plaintiff not only waived any statutory right she may have had in the defendant's property at the time of dissolution, but also she renounced her widow's share of the defendant's estate should he die during the term of their marriage and not bequeath her any of his property.

[14] At the time the parties signed the agreement, June 24, 1988, *McHugh*, which was decided in 1980, was the controlling law with regard to the enforcement of antenuptial agreements. We cannot overlook Page's testimony regarding her concern over the plaintiff's entering into the agreement. See footnote 4.

The issue essentially, as stated by the court, is that the value of the defendant's assets at the time of dissolution was greater than that of the plaintiff's. Although the absolute value of the defendant's assets increased, the evidence does not suggest that the increase was due to anything other than the defendant's maintaining his employment pursuant to the terms of the agreement and the appreciation in the value of his assets over time. The plaintiff has not argued that the appreciation of the defendant's assets was not in keeping with the economy's growth during the marriage. Furthermore, not only was the value of the defendant's assets greater than the plaintiff's when the agreement was signed, but also the plaintiff's income and assets increased during the marriage, as well. As the court found, her income rose over time, and she acquired equity in her business. In his brief, the defendant argues that the gross income of both of the parties increased about two and one-half times over the course of the marriage. That argument appears to be consistent with the court's findings.

On appeal, the plaintiff makes much of the fact that she and the defendant negotiated the family budget in such a way that she paid for the day-to-day expenses and he paid the mortgage. See footnote 16. Although the defendant's equity in the marital home may have increased during the marriage if he paid the mortgage, the court found that the value of the marital home had appreciated, which is a different matter entirely. As to the family budget, the plaintiff agreed to that financial arrangement knowing full well that the defendant owned the marital home and that the agreement permitted him to retain it and the rest of his assets should a divorce occur. The plaintiff also presumably was aware of the status of her investments and pension.[15] Moreover, the court found that "both parties made significant

[15] The court found that at the time of the marriage, the plaintiff owned a condominium unit in Bridgeport that had a value of $110,000 on which there was an initial mortgage of $100,000. At the time of dissolution, the unit had

contributions to the acquisition, maintenance and preservation of the family assets," including the marital home.[16]

At the time the parties signed the agreement, the defendant had been employed by General Electric for more than twenty-two years and had acquired certain pension and stock option benefits. The parties had known one another for several years prior to their marriage and, in fact, had resided together for some months before their wedding. The defendant's employment required him to travel a great deal, a fact the plaintiff knew before she married him. The plaintiff has highlighted no facts that the nature of the defendant's employment at the time of the dissolution was different from what it was at the time the parties married. At the time of dissolution, the defendant had been employed by General Electric for almost forty years. The plaintiff has not brought to our attention any evidence that the nature of the defendant's employment changed or that his salary and benefits changed in any fashion other than what one might expect for someone in his position. The plaintiff has failed to distinguish the parties' financial circumstances from those that were at issue in *Winchester* v. *McCue*, supra, 91 Conn. App. 721.

The reality of the parties' situation was explained in *Winchester*, in which those parties contemplated that the husband would continue working. "[I]t must have

a value of $140,000 and an outstanding mortgage of $40,000, with equity of $99,000.

[16] At trial, each of the parties presented expert testimony from real estate appraisers as to the value of the marital home. The appraisers agreed that the two acres on which the house is situated is worth between $940,000 and $1 million. The appraisers disagreed as to the value of the house. The defendant's appraiser opined that the house had reached the limit of its useful life and was without economic value. The plaintiff's appraiser valued the house at approximately $365,000 and also testified that real estate values in the two years prior to trial increased at 10 percent per annum. The court found the value at the time the defendant purchased the marital home from his mother to be $346,500 and the value at the time of trial to be $1,365,000.

been contemplated by the parties that the defendant would continue working in the corporate arena and that, over the course of years, his income would increase as well as his retirement benefits and investments. These circumstances do not constitute the type of dramatic or unusual circumstances contemplated by *McHugh*." Id., 731.[17]

We also cannot agree that the plaintiff's efforts alone contributed to the increased value of the parties' finances. In its memorandum of decision, the court discussed the evidence before it. Pursuant to the agreement, the plaintiff agreed to work throughout the marriage. She changed employment several times, eventually starting the business that she operated from the marital home, which is owned by the defendant. The court found that although the defendant was not in favor of the plaintiff's leaving the corporate world, he gave the plaintiff considerable assistance by keeping the books and developing a business plan for the plaintiff's company. The plaintiff's financial contributions from her employment therefore were not the result of her efforts alone. In addition, the plaintiff testified that she had not been as helpful to the defendant's career as she could have been.

It is apparent that the court, in rendering its judgment, was moved by equitable considerations codified in our statutes.[18] The court concluded that although the

---

[17] The plaintiff seeks to distinguish *Winchester* from the facts of this case on the basis of the court's finding that the dramatic change in the parties' financial circumstances was due to her financial and nonfinancial contributions, findings that were not present in *Winchester*. We need not address this argument, as we conclude that there are insufficient facts in the evidence to support the court's finding that there was a dramatic change in the parties' finances that was not contemplated at the time they signed the agreement.

[18] The defendant has posited that the court disfavors antenuptial agreements and supports his position with citations to other decisions of the court. See, e.g., *Montoya* v. *Montoya*, Superior Court, judicial district of Stamford-Norwalk, Docket No. FA-01-0183420 (March 4, 2003) (34 Conn. L. Rptr. 266) ("[a]s this court has often observed, an antenuptial agreement is the singularly most unromantic legal document imaginable").

agreement was valid at the time it was executed, the evidence supported a finding that the economic circumstances of the parties had "changed dramatically," particularly those of the defendant and, given the length of the marriage, the birth of two children and the plaintiff's substantial financial and nonfinancial contributions, that it would be inequitable to enforce the agreement. Those observations, however, have no bearing on whether the agreement should be enforced. See *Dornemann* v. *Dornemann*, 48 Conn. Sup. 502, 850 A.2d 273 (2004). The agreement required the court to adjudicate a contract action in which the traditional notions of equity are not germane because there was an agreement; see *Friezo* v. *Friezo*, supra, 281 Conn. 207–208 (*Norcott, J.*, dissenting); and the evidence does not support a finding that there was a dramatic change in the parties' financial circumstances. See *McHugh* v. *McHugh*, supra, 181 Conn. 485. In other words, whether the trial court or this court thinks the agreement was a good bargain for the plaintiff does not enter into the analysis of the issue.

"Whether provident or improvident, an agreement moved on calculated considerations is entitled to the sanction of the law . . . and even though a party might prefer to have the court decide the plain effect of his contract contrary to the expressed intention set forth in the agreement, it is not within the power of the court to make a new or different agreement." (Citation omitted.) *Collins* v. *Sears, Roebuck & Co.*, 164 Conn. 369, 375, 321 A.2d 444 (1973). "Courts of law must allow

The defendant also directed our attention to comments made by the court throughout the trial. "You've got to trust the system. The system is not going to leave anybody bereft of assets or income; the system is going to try to do what's equity." During final argument, the court asked the defendant's counsel: "[W]ould you be making the same argument to me, you and your client, if we were talking about a fifty year marriage? . . . At the end of fifty years, you would stand there in front of the court and say that all that goes on in a marriage over that span of time is for naught because we have a contract?"

parties to make their own contracts. With the wisdom or desirability of the provision they themselves have agreed upon the court is not concerned." *Connecticut Union of Telephone Workers* v. *Southern New England Telephone Co.*, 148 Conn. 192, 201, 169 A.2d 646 (1961).

Pursuant to *McHugh* and *Winchester*, which make it clear that the threshold for a finding of dramatic change in circumstances is high, we conclude that not only does the evidence not support the court's conclusion that there was a dramatic change in the financial circumstances of the parties between the time of their marriage and its dissolution but also that the financial circumstances that existed at the time of dissolution were well within the contemplation of the parties when they signed the agreement, i.e., that is why the defendant wanted the plaintiff to sign the agreement. Moreover, the agreement itself anticipated the type of dramatic change in circumstances that might render the agreement unenforceable, shedding light on the parties' understanding of what they were agreeing to.

Section 5.9 of the agreement states, in part, that "[i]n the event of any radical changes in the personal circumstances of a party hereto (including, by way of example, but not limited to, development of a *disabling* physical or mental condition reasonably anticipated to be permanent or of a long duration), then the party whose circumstances have so changed shall have the right to seek a modification of this Agreement . . . ." (Emphasis added.) The dramatic financial change found by the court evolved during the parties' marriage and was within their control. The record does not reflect why the parties agreed to use her income to pay for the daily living expenses of the family and permitted the defendant to increase the equity in the marital home that she knew he owned. Whatever the reason, it does not fall within the category of radical changes contemplated by *McHugh* or the parties themselves.

In sum, we conclude that the enforcement of the agreement is required under *McHugh* and that enforcement will not work an injustice on the parties. We therefore reverse that portion of the judgment requiring the defendant to pay the plaintiff time limited alimony, attorney's fees, a lump sum property settlement and a portion of his pension and investments.

II

The defendant claims that the court improperly ordered him to maintain $1.5 million in life insurance because (1) the court lacked jurisdiction to order him to maintain life insurance for the benefit of an adult child and lacked evidence of his insurability and the cost of such insurance, and (2) the amount ordered is excessive. We disagree.

The defendant's claim concerns the following order of the court: "The [defendant] shall maintain $1.5 million of the *existing* life insurance, and shall name the [plaintiff] and children as equal beneficiaries thereof for so long as he has an obligation to pay alimony and/or child support under the terms of this decree. The foregoing notwithstanding, upon the termination of the [defendant's] alimony obligation to the [plaintiff], he may reduce his life insurance to $1 million, naming each child as equal beneficiary thereof for so long as he has a child support obligation to either one and/or so long as he has an obligation under an educational support order entered pursuant to General Statutes § 46b-56c."[19] (Emphasis added.)

---

[19] In its amendment to the memorandum of decision, the court ordered: "Commencing September 1, 2005, and monthly thereafter, the [defendant] shall pay to the [plaintiff] the sum of $1439 as and for child support, until such time as the [older] child shall reach the age of eighteen years or shall be otherwise emancipated, at which time child support for the remaining child shall be adjusted in accordance with the then existing child support guidelines or as a court may otherwise direct.

"In addition, commencing September 1, 2005, for so long as he has an outstanding child support obligation, within two (2) weeks after receipt by the [defendant] of any gross additional cash compensation from his

The defendant's claim implicates General Statutes §§ 46b-56c, 46b-82 and 46b-84.[20] Construction of a statute calls for the plenary standard of review. See *Robinson* v. *Robinson*, 86 Conn. App. 719, 724, 862 A.2d 326 (2004). "In fashioning its financial orders [however] the court has broad discretion, and [j]udicial review of a trial court's exercise of [this] broad discretion . . . is limited to the questions of whether the . . . court correctly applied the law and could reasonably have concluded as it did. . . . In making those determinations, we allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action. . . . That standard of review reflects the sound policy that the trial court has the unique opportunity to view the parties and their testimony, and is therefore in the best position to assess all of the circumstances surrounding a dissolution action, including such factors as the demeanor and the attitude of the parties." (Citation omitted; internal quotation marks omitted.) *Mann* v. *Miller*, 93 Conn. App. 809, 812, 890 A.2d 581 (2006).

A

The defendant claims that it was improper for the court to order him to maintain existing life insurance,

employment (including but not limited to any bonus or incentive pay), the [defendant] shall pay to the [plaintiff] 15 percent of such gross additional cash compensation in excess of $130,000 per year up to and including $230,000, and 10 percent of the next $100,000 of such gross additional cash compensation in any calendar year, as and for additional child support. Meaning and intending by this order that future additional child support shall be based upon his income in excess of $130,000 up to and including $330,000 of the [defendant's] cash compensation from employment and that all earnings in excess thereof shall be exempt. The [defendant] shall provide satisfactory evidence to the [plaintiff] of this additional cash compensation twelve months from the date of this order and every twelve months thereafter so long as he has a child support obligation hereunder.

"The foregoing notwithstanding, if any child shall turn eighteen years old and is still in high school, then, in that event, the child support shall continue until the first day of the next month following graduation from high school or . . . nineteenth birthday, whichever shall sooner occur, pursuant to General Statutes § 46b-84 (b)."

[20] The statutes enumerated concern educational support orders, alimony and child support, respectively.

naming his children as beneficiaries, as long as he has an obligation to pay child support and provide educational support pursuant to § 46b-56c. The claim has no merit.

The defendant first argues that the court lacked subject matter jurisdiction to order him to maintain his life insurance for the benefit of his children because it constitutes postmajority support in violation of the rule set out in *Broaca* v. *Broaca*, 181 Conn. 463, 435 A.2d 1016 (1980). *Broaca*, however, did not concern an educational support order. In that case, our Supreme Court held that a parent ordered to pay child support pursuant to § 46b-84 was not required to secure his or her child support obligations by means of a life insurance policy after the child had reached the age of eighteen, the age at which a child reaches majority. Id., 465–66. The defendant also argues that a parent cannot be required to name his or her children who are older than eighteen as the irrevocable beneficiaries of a life insurance policy, citing *Arseniadis* v. *Arseniadis*, 2 Conn. App. 239, 242–43, 477 A.2d 152 (1984). *Arseniadis* was decided pursuant to Public Acts 1977, No. 77-488, § 1, then General Statutes § 46-49, now General Statutes § 46b-66, not § 46b-56c.

The defendant relies, as well, on *Loughlin* v. *Loughlin*, 93 Conn. App. 618, 889 A.2d 902, aff'd, 280 Conn. 632, 910 A.2d 963 (2006), to support his claim. "As a general matter, [t]he obligation of a parent to support a child terminates when the child attains the age of majority, which, in this state, is eighteen. General Statutes § 1-1d . . . . The statutory grant of jurisdiction to the Superior Court in matters relating to child support incident to the dissolution of a marriage likewise expressly circumscribes the court's jurisdiction to orders involving only minor children." (Citations omitted; internal quotation marks omitted.) *Loughlin* v. *Loughlin*, supra, 635.

The defendant contends, however, that the statutory exceptions to the general rule cited in *Loughlin* do not apply to the facts of this case. "Additional statutory provisions may apply, however, to modify this general rule. Pursuant to General Statutes § 46b-66 (a), a court in a dissolution proceeding may enter an order providing for postmajority child support when the parties have agreed in writing to the terms of that order. Under a more recently enacted provision, upon motion of a party and after making certain subsidiary findings, a court may issue an educational support order for college age children. See General Statutes § 46b-56c (b), (c), (e) . . . . Such an order may require one or both parties to a dissolution action to provide support to a child, until the child reaches the age of twenty-three, for certain enumerated educational expenses. In the absence of a statute or agreement providing for postmajority assistance, however, a parent ordinarily is under no legal obligation to support an adult child." (Citation omitted; internal quotation marks omitted.) *Loughlin* v. *Loughlin*, supra, 93 Conn. App. 635–36.

In this case, the parties stipulated that had the family been intact at the time the children were of an age to attend college, they would have sent their children to college, and the court found that the stipulation brought the issue within the ambit of § 46b-56c. The court complied with § 46b-56c (c) by finding "that it is more likely than not that the parties would have provided support for their [children's] college education had the family remained intact." See also *Sander* v. *Sander*, 96 Conn. App. 102, 115–16, 899 A.2d 670 (2006). Because the statutory scheme anticipates that a dissolution may occur in advance of the time postsecondary educational decisions appropriately can be made, it provides a mechanism for the court to retain jurisdiction for the purpose of ordering educational support for adult children. In its orders, the court reserved jurisdiction to

enter an educational support order pursuant to § 46b-56c (b) at an appropriate time.[21]

The defendant next argues that at the time the court issued the order requiring him to maintain life insurance for the benefit of his children, no educational support order was in effect and that it may come to pass that such an order is never entered. Although an educational support order may never be entered, speculation of that nature is not germane to the decision to be made here.

---

[21] General Statutes § 46b-56c provides in relevant part: "(a) For purposes of this section, an educational support order is an order entered by a court requiring a parent to provide support for a child or children to attend for up to a total of four full academic years an institution of higher education or a private occupational school for the purpose of attaining a bachelor's or other undergraduate degree, or other appropriate vocational instruction. An educational support order may be entered with respect to any child who has not attained twenty-three years of age and shall terminate not later than the date on which the child attains twenty-three years of age.

"(b) (1) On motion or petition of a parent, the court may enter an educational support order at the time of entry of a decree of dissolution . . . and no educational support order may be entered thereafter unless the decree explicitly provides that a motion or petition for an educational support order may be filed by either parent at a subsequent date. . . .

"(c) The court may not enter an educational support order pursuant to this section unless the court finds as a matter of fact that it is more likely than not that the parents would have provided support to the child for higher education or private occupational school if the family were intact. After making such finding, the court, in determining whether to enter an educational support order, shall consider all relevant circumstances, including . . . .

"(f) The educational support order may include support for any necessary educational expense, including room, board, dues, tuition, fees, registration and application costs, but such expenses shall not be more than the amount charged by The University of Connecticut for a full-time in-state student at the time the child for whom educational support is being ordered matriculates, except this limit may be exceeded by agreement of the parents. An educational support order may also include the cost of books and medical insurance for such child.

"(g) The court may direct that payments under an educational support order be made (1) to a parent to be forwarded to the institution of higher education or private occupational school, (2) directly to the institution or school, or (3) *otherwise as the court determines to be appropriate.* . . ." (Emphasis added.)

We note that decisions about postsecondary education usually occur at about the time a person becomes eighteen years of age. The defendant does not argue that the court abused its discretion by requiring him to maintain life insurance for the benefit of his children while they are minors. The court did not abuse its discretion, therefore, by issuing a financial order that would secure any educational support order that might be entered in the future, at about the time the children become eighteen and are making decisions about their educational futures. It is often said that common sense is not left at the courthouse door. See *Meehan* v. *Meehan*, 40 Conn. App. 107, 113, 669 A.2d 616, cert. denied, 236 Conn. 915, 673 A.2d 1142 (1996). As a matter of judicial economy, it would not be practical to require the defendant to maintain life insurance for the benefit of a minor child, terminate it when the child becomes eighteen and reinstitute it some months later when the adult child matriculates at a postsecondary educational institution as the beneficiary of an educational support order. See General Statutes § 46b-56c (g) (3).

Our analysis is guided by this court's decision in *Sander* v. *Sander*, supra, 96 Conn. App. 102.[22] The court in *Sander* ordered the sale of the parties' Vermont vacation home and that $75,000 of the proceeds of sale be held in trust for the education of the parties' daughter pursuant to § 46b-56c. Id., 115. The plaintiff challenged the propriety of that order on appeal. Id. General Statutes § 46b-56c (h) provides in relevant part that "an educational support order may be modified or enforced

---

[22] The defendant contends in his reply brief that *Sander* is factually inapposite because the court there entered an educational support order. We disagree. In *Sander*, the court's order provided a means of funding the postsecondary education of the parties' child, who was in the eighth grade at the time of dissolution. "[T]he court did not abuse its discretion by entering an educational support order to provide for [the parties'] daughter's higher education, *should the need arise*." (Emphasis added.) *Sander* v. *Sander*, supra, 96 Conn. App. 119.

in the same manner as is provided by law for any support order." See *Sander* v. *Sander,* supra, 120. General Statutes § 46b-84 (f) concerns a parent's obligation to provide maintenance for a minor child. It provides in relevant part that "[t]he court shall make and enforce the decree for the maintenance of the child as it considers just, and may direct security to be given therefor . . . . Similarly, § 46b-82 (a), relating to alimony, provides in relevant part that [t]he order may direct the security be given therefor on such terms as the court may deem desirable . . . . As a court may enforce these support orders by requiring that security be given, a court similarly may enforce an educational support order by requiring that security be given." *Sander* v. *Sander,* supra, 120.

"In making its [financial] orders . . . a trial court is afforded a wide latitude of discretion. . . . The creation of a trust to fund an educational support order fits well within that latitude of discretion. . . . In *Louney* v. *Louney,* 13 Conn. App. 270, 274–75, 535 A.2d 1318 (1988), this court upheld an order in a dissolution action requiring that funds held in joint accounts be used for the designated purpose of the education of the parties' minor children. Here, the court similarly established a trust to hold the parties' money for the express purpose of their daughter's college education pursuant to § 46b-56c." *Sander* v. *Sander,* supra, 96 Conn. App. 121. This court concluded that the trial court had exercised authority within its discretion to establish a trust as an appropriate means to secure an educational support order. Id., 121–22. We therefore conclude that the court in this case properly exercised its authority by requiring the defendant to maintain $1 million in existing life insurance to secure any future educational support order that may be entered for the benefit of the parties' children.

## B

The defendant also claims that the court improperly ordered him to provide life insurance for the benefit of the parties' children in the absence of evidence of his insurability, cost and amount. We disagree.

"Our standard of review in a domestic relations case is well settled. We will not substitute our judgment for that of the trial court and will not disturb an order of the trial court absent an abuse of discretion or findings lacking a reasonable basis in the facts. . . . An order for life insurance is very often an appropriate and necessary component of a judgment of dissolution of marriage. . . . Such an order, however, must have a reasonable basis in the evidence." (Citations omitted; internal quotation marks omitted.) *Quindazzi* v. *Quindazzi*, 56 Conn. App. 336, 338, 742 A.2d 838 (2000).

In *Michel* v. *Michel*, 31 Conn. App. 338, 624 A.2d 914 (1993), this court reversed the judgment of dissolution after the trial court had ordered the plaintiff to secure his alimony and support obligations with life insurance without any evidence of the cost or availability of the insurance to the plaintiff. Id., 340–41. "[O]rders requiring the maintenance of life insurance have been approved on numerous occasions by our courts. . . . [In cases in which it has been approved] it is important to note that the life insurance policy was in existence at the time of judgment." Id., 340.

In this case, the court ordered the defendant to maintain $1.5 million of *existing* life insurance. The defendant's financial affidavit indicates that at the time of the dissolution, he had life insurance in excess of $1.7 million. This court has held that "where a life insurance policy is in existence [at] the time of the judgment, the court has available to it all of the information necessary to craft an appropriate order regarding such insurance. *Porter* v. *Porter*, 61 Conn. App. 791, 805, 769 A.2d 725

(2001)." *Bee* v. *Bee*, 79 Conn. App. 783, 794, 831 A.2d 833, cert. denied, 266 Conn. 932, 837 A.2d 805 (2003).

The defendant also claims that it was inappropriate for the court to order that the children be the beneficiaries of the policy rather than the educational institutions they may attend. This argument finds no support in § 46b-56c (g), which provides that payments under an educational support order are to be made to a parent to be forwarded to an institution of higher education, to the institution or "otherwise as the court determines to be appropriate." We conclude, therefore, that the court's order was not improper on that basis.

C

In addition to his claim that he cannot be ordered to provide life insurance to secure an educational support order after his children reach the age of eighteen, the defendant argues that the court's order would require him to maintain the life insurance policy as long as he is required to pay alimony, which could be until August 31, 2010. In part I, we concluded that the court improperly awarded the plaintiff alimony. In the event that the defendant is not obligated to pay the plaintiff alimony, the court's order reduced the amount of life insurance he was required to maintain to $1 million for the benefit of each of his children equally. The court, however, did not ground its life insurance order in alimony only. To the extent that the defendant has an obligation to pay child support, the court acted within its discretion to secure that obligation by requiring the defendant to maintain $1.5 million of life insurance payable to the plaintiff, his daughter and son in equal shares.

We agree with the defendant that the language of the life insurance order as to duration is ambiguous and may require him to provide insurance for the benefit of one of his children who reaches the age of majority and is not the beneficiary of an educational support

order. The court's order as to life insurance states that the defendant "may reduce his life insurance to $1 million, naming each child as equal beneficiary thereof so long as he has a child support obligation to either one and/or so long as he has an obligation under an educational support order . . . ." The defendant is not obligated to support either one of his children after she or he reaches the age of eighteen, unless it is pursuant to an educational support order. See *Loughlin* v. *Loughlin*, supra, 93 Conn. App. 635–36. To the extent that the court's order requires the defendant to maintain $500,000 of life insurance for the benefit of either one of his children, if that child is eighteen or older and not benefiting from an educational support order, it constitutes an abuse of the court's discretion.

"Although we recognize that often [t]he rendering of a judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other"; (internal quotation marks omitted) *Lowe* v. *Lowe*, 47 Conn. App. 354, 358, 704 A.2d 236 (1997); we conclude that this is not such a case. The issue of life insurance is separate and distinct from the court's other financial orders. A remand for a review of all of the court's financial orders is, therefore, not necessary. Id.

Because the court's order may require the defendant to maintain life insurance to secure an alimony obligation and support of a child who has reached the age of eighteen and who is not the beneficiary of an educational support order, the judgment is reversed and the case is remanded for clarification. The court's order regarding life insurance is affirmed in all other respects.

III

The defendant's third claim is that the court improperly ordered periodic payments to be made from income that would be eliminated when the defendant complied

with the court's property distribution and fee orders. Because we concluded in part I that the court improperly ordered the defendant to make a lump sum property award to the plaintiff as well as time limited alimony payments, attorney's fees and a portion of the defendant's investments and pensions, we need not consider this claim. To the extent that the court ordered the defendant to make child support payments to the plaintiff for the benefit of the parties' minor children, the court's award is affirmed. The defendant has failed to demonstrate that the court's child support order does not conform to the statutory scheme or the child support guidelines.

## IV

The defendant's last claim is that two of the court's factual findings were clearly erroneous, specifically that he bore the greater responsibility for the breakdown of the parties' marriage and that the plaintiff's income was a minimum of $100,000. We do not agree.

"We have long held that a finding of fact is reversed only when it is clearly erroneous. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . Simply put, we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *Greco* v. *Greco*, 70 Conn. App. 735, 736–37, 799 A.2d 331 (2002).

## A

The defendant claims that the court's finding that he bore a greater responsibility for the breakdown of the parties' marriage was clearly erroneous. The defendant

argues that the court's finding was predicated on the court's looking on the agreement with disfavor. See footnote 18. The defendant's argument, however, does not encompass the whole of the court's finding.

The court found that "the marriage of the parties has broken down irretrievably, and that ample evidence exists that both parties have contributed to said breakdown. However, the court finds that after considering all the evidence and hearing the testimony of the parties, that the [defendant] must bear a disproportionately greater share of responsibility for the breakdown, since it was he [who] set the tone, starting with the antenuptial agreement, the segregation of assets, particularly the marital home, as well as the heavy double burden imposed upon the [plaintiff] to obtain gainful employment and to maintain the household, including the responsibility for rearing the two children, one of whom had learning disabilities. The evidence supports the court's observation that, during the early years, the marriage was a partnership between two hardworking, career oriented people with demanding jobs and that when the children came along, the [plaintiff] assumed the primary homemaking duties as well and literally wore herself to a frazzle, with little help and virtually no appreciation of her efforts by the [defendant]. Things have been going inexorably downhill since."

On the basis of our review of the record, we conclude that the court's finding is supported by the evidence cited by the court in its memorandum of decision. Among the specific causes of the breakdown, the plaintiff cited the defendant's viewing of pornography, his temper and drinking, his not being there for her and their frequent disputes over finances. She also claimed that the defendant did not participate in family life. The defendant did not share his travel itinerary with her, requiring the plaintiff to communicate with him through

his secretary. The plaintiff admitted that she contributed to the breakdown of the marriage because she was not emotionally available to the defendant and that she was not helpful to his career. She accompanied him on some, but not all, business trips, when she was invited. The defendant complained that for days after he returned from a business trip, the plaintiff gave him the cold shoulder. The plaintiff responded to the defendant, "that's just me; deal with it." Both prior to and during the course of their marriage, the parties engaged in counseling.[23] The plaintiff entered counseling during the marriage because she did not like the way the defendant treated her or the children.[24] The defendant stopped going to counseling. The court found that the defendant's longtime sexual relationship with a business colleague, which began in about 1993, was not the cause of the breakdown of the marriage, which was "dying by inches." The affair was an indirect cause of the breakdown and was evidence of the defendant's less than total commitment to the union.

On appeal, the defendant argues that he should not bear responsibility for the tone of the marriage and the agreement because the plaintiff signed the agreement and the parties abided by it. He also argues that antenuptial agreements further the public policy of the state by encouraging spouses to order their affairs to avoid

[23] The parties had separated for six to eight weeks prior to their marriage.

[24] The court found that one of the prime stressors in the marriage was the parties' dispute over the severity of their son's disabilities. The plaintiff noticed development problems when the child was six months old. The defendant refused to believe there was a problem, even after it persisted. Eventually, the boy was diagnosed with pervasive development disorder. He has received a battery of services and was expected, at the time of the trial, to enter the seventh grade enrolled as a regular classroom student.

The parties also had different philosophies about how to discipline their children. The defendant was more physical, had a temper and yelled frequently. The defendant's relationship with the daughter is strained, in part by the plaintiff's disclosure, when asked by the daughter, that the defendant had had an extramarital affair.

acrimonious dissolution litigation. As is often stated, we do not reverse the factual findings of the trial court unless they are clearly erroneous and find no support in the evidence. See *Weinstein* v. *Weinstein*, 104 Conn. App. 482, 487, 934 A.2d 306 (2007), cert. denied, 285 Conn. 911, 943 A.2d 472 (2008). We cannot say that the challenged finding is clearly erroneous because we cannot conclude that the court based its decision solely, or even principally, on its purported hostility toward antenuptial agreements. Moreover, regardless of whether the plaintiff signed the agreement, the court found facts indicating that she carried a disproportionate burden during the marriage of maintaining the home and rearing the children. Over time, the agreement, which the defendant insisted at trial was " 'the deal,' "[25]

[25] On direct examination, the defendant testified in part: "I had just been divorced five years earlier and had gone through a process. I did not want to expose any of my assets to a process like what we're going through now. I had hoped to avoid that, and there was a clear statement to that effect. As far as having a wife work, there are many reasons. Her, personally, I felt that many of the issues in the first marriage were because my wife didn't understand my job, and having a professional life was important. The second reason was—well, the primary reason at all was to have children, and that if we were going to have children, I did not want to be the sole support of those children. I wanted a wife that could incur expenses. I felt it was important for her to have money of her own that she had discretion over, and that in the best of cases it represented an improvement in lifestyle for the children, and in the worst of cases if something happened to me, she was prepared to take care of them."

On cross-examination, the defendant testified in part:

"[The Plaintiff's Counsel]: Was it part of the deal—would it have been part of the deal if [the plaintiff] had elected to stay home with the children and be a full-time homemaker?

"[The Defendant]: No, that was not part of the deal.

"[The Plaintiff's Counsel]: Okay. And showing you exhibit nine, which is the prenuptial agreement, can you tell me where that arrangement is outside the parameters of your agreement?

\* \* \*

"[The Defendant]: Each party affirms to the other his or her respective ability now and [in] the future [to] be gainfully employed and, or, their respective ability, and an obligation to protect themselves from involuntary or voluntary termination of employment throughout—including long-term disability.

took its toll physically and emotionally on the plaintiff and ultimately the marriage.

## B

The defendant also claims that the court should have found that the plaintiff's annual income was $145,467 on the basis of the testimony of his expert witness. He further claims that the court found the plaintiff's annual income to be a minimum of $100,000. The defendant's claim mischaracterizes the court's finding, for which there is support in the evidence.

In its amendment to its memorandum of decision, the court found that "the testimony and evidence support a finding by the court that the [plaintiff's] earnings from her employment [are] a minimum of $100,000 per annum; that she receives an additional $1200 per annum in net rental income; and that her net income is $69,056 per annum." On the basis of our review of the evidence, it appears that the court rejected the plaintiff's evidence that she earned just $75,000 a year and the testimony of the defendant's expert. The trial court is the arbiter of credibility, and it may accept all, some or none of a witness' testimony. See *DiVito* v. *DiVito*, 77 Conn. App. 124, 138, 822 A.2d 294, cert. denied, 264 Conn. 921, 828 A.2d 617 (2003).

Finally, "§ 46b-84 (d) requires the court to consider the *amount and sources of income* of the parties when rendering an award of child support. . . . It is well established in this state's jurisprudence that *amount and sources of income* has been consistently construed

* * *

"[The Plaintiff's Counsel]: Now, sir, when [the plaintiff] decided that she can no longer commute and work full-time in a corporate job and decided to sell promotional items full-time, you disapproved of that, you objected to that, did you not?

"[The Defendant]: I was not in favor of it, yes."

by the appellate courts of this state as limited to available net income, however, rather than gross income." (Emphasis added; internal quotation marks omitted.) *Morris* v. *Morris*, 262 Conn. 299, 305–306, 811 A.2d 1283 (2003). The defendant has failed to demonstrate that the court's financial orders were based on anything other than the net income of the parties. The defendant, therefore, cannot prevail on his claims that the court's factual determinations were clearly erroneous.

The judgment is reversed as to the court's financial orders awarding the plaintiff a lump sum payment, alimony, portions of the defendant's investments and pension and attorney's fees. The case is remanded to the trial court for clarification of its life insurance orders pursuant to law and to enforce the agreement; the judgment is affirmed in all other respects.

In this opinion STOUGHTON, J., concurred.

GRUENDEL, J., dissenting in part. Because this case concerns an antenuptial agreement entered into by the parties prior to the passage of General Statutes §§ 46b-36a to 46b-36j, it is governed by common-law principles.[1] In *McHugh* v. *McHugh*, 181 Conn. 482, 436 A.2d 8 (1980), our Supreme Court set forth those principles, which are used by trial courts in determining the enforceability of such antenuptial agreements in this state. That decision is the controlling law for pre-1995 agreements, binding on trial courts and on this court. In today's decision, the majority concludes that the only basis on which the trial court determined that the parties' antenuptial agreement should not be enforced was the finding that the economic circumstances of the parties had changed dramatically from the time the

---

[1] General Statutes § 46b-36j provides: "Nothing in sections 46b-36a to 46b-36j, inclusive, shall be deemed to affect the validity of any premarital agreement made prior to October 1, 1995."

parties had entered into the agreement. It then concludes that the facts in the record do not support such a finding and that, therefore, the court should have enforced the antenuptial agreement. My reading of the trial court's decision is not so limited. First, I believe that the court's determination not to enforce the agreement was based on a variety of findings, and a change in economic circumstances was but one of those findings. Second, I believe that there is evidence in the record to support the facts as found by the court. Moreover, even if there were insufficient facts in the record to support the court's finding that there was a dramatic change in the economic circumstances of the parties, the court made other findings of fact that are sufficient to support its conclusion not to enforce the antenuptial agreement. I, therefore, dissent from that portion of the majority opinion that holds that the court incorrectly determined that the parties' antenuptial agreement was unenforceable. I concur with the remainder of the majority's analysis.

In *McHugh*, our Supreme Court articulated a three-pronged test for determining the enforceability of antenuptial agreements. Only the third of those prongs is relevant to this appeal. "Antenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable where . . . the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice." Id., 485–86. That third prong requires a court considering the enforceability of an antenuptial agreement to take into account two things: whether the circumstances of the parties had changed since their entry into the agreement and, if so, whether its enforcement would work an injustice. The *McHugh* court set

forth a number of circumstances that could preclude the enforcement of antenuptial agreements. It concluded by stating: "Finally, an antenuptial agreement will not be enforced where the circumstances of the parties at the time of the dissolution are so far beyond the contemplation of the parties at the time the agreement was made as to make enforcement of the agreement work an injustice. . . . Thus, where a marriage is dissolved not because it has broken down irretrievably, but because of the fault of one of the parties, an antenuptial waiver of rights executed by the innocent party may not be enforceable, depending upon the circumstances of the particular case and the language of the agreement. . . . Likewise, where the economic status of parties has changed dramatically between the date of the agreement and the dissolution, literal enforcement of the agreement may work injustice." (Citations omitted.) Id., 489.

The majority narrows the *McHugh* analysis by focusing solely on a change in the *economic* circumstances between the signing of the agreement and the dissolution of the marriage, rather than the broader analysis of change in circumstances mandated by *McHugh* and correctly employed by the trial court. It does so because it concludes that the court's finding that there was a dramatic change in the economic circumstances of the parties was the only "*McHugh* factor" on which the court based its decision not to enforce the agreement. That analysis, however, ignores the other factual findings made by the court, and detailed in its memorandum of decision, that support a finding of a change in circumstances such that enforcement of the antenuptial agreement would work an injustice. *McHugh* stands for the proposition that an antenuptial agreement will be enforced unless there are changes in the circumstances of the parties that would make its enforcement at the time of the dissolution inequitable. Change in economic

circumstances is only one such change in circumstance, and the only one requiring a "dramatic" change. *McHugh* v. *McHugh,* supra, 181 Conn. 489.

I begin my analysis with a discussion of the appropriate standard of review. In this appeal, our task is to determine whether the court properly concluded that the antenuptial agreement was unenforceable. That determination, being an order from the family court, is one that should be subject to the abuse of discretion standard of review. *Ranfone* v. *Ranfone,* 103 Conn. App. 243, 246, 928 A.2d 575, cert. denied, 284 Conn. 940, 937 A.2d 698 (2007); see also *Weinstein* v. *Weinstein,* 280 Conn. 764, 774–75, 911 A.2d 1077, after remand, 104 Conn. App. 482, 934 A.2d 306 (2007), cert. denied, 285 Conn. 911, 943 A.2d 472 (2008). Nevertheless, the majority states that the court's conclusion is a mixed question of law and fact and, as such, should be subject to plenary review. See *Winchester* v. *McCue,* 91 Conn. App. 721, 726, 882 A.2d 143, cert. denied, 276 Conn. 922, 888 A.2d 91 (2005).[2] Even under the plenary standard of review, however, this court's duty is to decide whether the trial court's legal conclusion is legally and logically correct and finds support in the facts that appear in the record. See id. The only legal conclusion made by the court was its determination not to enforce the antenuptial agreement in accordance with the test set out in *McHugh.* Whether the parties' financial circumstances had changed since they entered into the agreement is a question of fact that this court will overturn only if the trial court's finding was clearly erroneous. See *Brycki* v. *Brycki,* 91 Conn. App. 579, 589, 881 A.2d 1056 (2005). "A factual finding is clearly erroneous when it is not

---

[2] Although in *Winchester* v. *McCue,* supra, 91 Conn. App. 721, a case also involving a pre-1995 antenuptial agreement, this court applied a plenary standard of review to an issue it characterized as a mixed question of law and fact, our Supreme Court has not definitively addressed the standard of review to be applied when reviewing a court's determination not to enforce an antenuptial agreement according to *McHugh.*

supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . Simply put, we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) Id. If there is any evidence in the record to support the court's findings of fact, they must stand.

In the present case, in concluding that it would be inequitable to enforce the antenuptial agreement, the court made various factual findings. The court found that "the marriage has broken down irretrievably, and that ample evidence exists that both parties have contributed to said breakdown. However, the court finds that the [defendant, Stephen L. Crews] must bear a disproportionately greater share of responsibility for the breakdown, since it was he [who] set the tone, starting with the antenuptial agreement [and] the segregation of assets, particularly the marital home . . . ."[3] The court also found that the defendant placed a "heavy double burden . . . upon the [plaintiff, Melinda Crews] to obtain gainful employment and to maintain the household, including the responsibility for rearing the [parties'] two children, one of whom had learning disabilities." Moreover, the court found that the evidence supported a finding "that, during the early years, the marriage was a partnership between two hardworking, career oriented people with demanding jobs and that when the children came along, the [plaintiff] literally wore herself to a frazzle, with little help and virtually no appreciation of her efforts by the [defendant]." Finally, the court found that "the economic circumstances of the parties have changed dramatically

---

[3] The majority reads this finding by the court to mean that the court did not find either party at fault for the marital breakdown. We are not free, in my view, to pick and choose among the trial court's factual findings to bolster our analysis.

between the date of the agreement and the dissolution, in particular the economic circumstances of the [defendant], due in substantial part to the efforts of the [plaintiff]." Contrary to the majority's contention that these findings have no bearing on whether the agreement should be enforced, taken together, these facts satisfy the *McHugh* test for determining that the circumstances of the parties had changed so far beyond their contemplation at the time the agreement was made that enforcement of the antenuptial agreement would work an injustice.

These factual findings are supported by the record. There was evidence in the record that the plaintiff testified that her day began at 2 a.m. and ended well into the following evening; that she was responsible for the defendant's hunting dogs and took the family trash to the dump; that the defendant traveled 60 to 70 percent of the time; that the defendant provided the plaintiff little help with the primary household duties and child rearing; that the defendant insisted that the plaintiff communicate through his secretary while he was away and did not share his travel itinerary with her; that the defendant had a longtime sexual relationship with a business colleague; that the defendant viewed pornography both on video and on the Internet; and that the defendant had a temper and drank. In addition, the court heard testimony regarding the finances of both the plaintiff and the defendant, including the value of the marital home, their respective incomes and investments.

After making its findings, the court concluded that "given the length of the marriage, the birth of two children, and the substantial financial and nonfinancial contributions of the [plaintiff] from employment outside of the home to her parenting and homemaking efforts, it would be inequitable to enforce the terms of the prenuptial agreement of the parties." Although the court

did not use the words found in *McHugh* v. *McHugh*, supra, 181 Conn. 485–86, that the changes were "so beyond the contemplation of the parties at the time the contract was entered into," in concluding that it would be inequitable to enforce the antenuptial agreement, it necessarily found that the circumstances of the parties were not within their contemplation at the time they entered into the antenuptial agreement. "The fact that the trial court did not utter the talismanic words . . . does not indicate that it did not make such a determination." *State* v. *Robinson*, 227 Conn. 711, 731, 631 A.2d 288 (1993). To conclude otherwise is to elevate form over substance. Because the court necessarily had to find that the changed circumstances were so far beyond the contemplation of the parties at the time they entered into the agreement in order to find that enforcement of the antenuptial agreement was inequitable, I conclude that, in substance, the court made this necessary finding.[4] Affording the necessary deference that our law requires, I would conclude that because there was support in the record for the court's factual findings, they were not clearly erroneous. As such, the court did not abuse its discretion when it determined, on the basis of those findings, that the enforcement of the antenuptial agreement would work an injustice.

Accordingly, I respectfully dissent from that portion of the majority opinion that holds that the trial court

[4] After the judgment, but prior to the appeal, the defendant filed a motion for articulation, requesting that the court explain the unforeseen nature of the change the court had found in the economic circumstances of the parties. As there was no appeal filed, the court declined to articulate its decision at that time but stated that it would grant a motion for articulation if and when an appeal was filed. The defendant subsequently filed his appeal but failed to request an articulation from the court. To the extent that the court's decision is ambiguous in this regard, it was the defendant's responsibility to seek to have it clarified. See Practice Book §§ 61-10 and 66-5. "[W]e read an ambiguous record, in the absence of a motion for articulation, to support rather than to undermine the judgment." (Internal quotation marks omitted.) *Zabaneh* v. *Dan Beard Associates, LLC*, 105 Conn. App. 134, 142, 937 A.2d 706, cert. denied, 286 Conn. 916, 945 A.2d 979 (2008).

incorrectly determined that the parties' antenuptial agreement was unenforceable. I concur with the remainder of the majority's analysis.